# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1456

_____

National Labor Relations Board     *
    *
         Petitioner,     *
    *   Petition to Enforce Order
      v.     *   of the National Labor
    *   Relations Board.
Hardesty Company, Inc.,     *
    *
         Respondent.     *

_____

Submitted: September 12, 2002

Filed: October 16, 2002

_____

Before McMILLIAN, BRIGHT, and BOWMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

The National Labor Relations Board (Board) filed this petition to enforce its decision and Order finding that the respondent, Hardesty Company, Inc., (Company or Hardesty) violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act), 49 Stat. 452, as amended, 29 U.S.C. §§ 158(a)(1) and 158(a)(5) (2000). The Board concluded that the Company violated these provisions by refusing to provide information requested by the Union; by unilaterally changing benefits and wage rates; by engaging in a course of surface bargaining in violation of its duty to bargain collectively with the employees; and by interfering with, restraining, or coercing employees in the exercise of their rights guaranteed under the Act. We have

jurisdiction pursuant to § 10(e) of the Act (29 U.S.C. § 160(e)) and, for the reasons set forth below, hold that the decision of the Board was supported by sufficient evidence based on the record as a whole and therefore grant enforcement of the Board's petition.

The facts of this case are, with some exceptions, not in dispute and have been reported below in the decisions of the Board and the Administrative Law Judge (ALJ). *See Hardesty Company, Inc.*, 336 N.L.R.B. No. 18 (Sept. 28, 2001) (available at 2001 WL 1216971). The Hardesty Company distributes ready-mix concrete to its customers via some twenty-seven facilities throughout Oklahoma and Arkansas. On August 21, 1995, following an organizing campaign and a Board-supervised election, Teamsters Local 373 (Union) was certified as the collective bargaining representative of the drivers, batchmen, mechanics, and front-end loaders of the Company's Fort Smith and Van Buren facilities. The Company recognized the Union as the exclusive bargaining representative of its employees at these two facilities and, in October of 1995, the Union and the Company began negotiations to reach a collective bargaining agreement. Although the parties reached agreement on a number of items, in February and March of 1996, the Company introduced a series of proposals that would have frozen wages; eliminated overtime, bonuses, and the 401(k) plan; and reduced the amount of vacation time. Also, effective June 1, 1996, the Company switched health insurance providers without consulting the Union. The parties met for their last bargaining session in September of 1996 and still have not signed a collective bargaining agreement. Based on a series of unfair labor practice charges filed by the Union before and after negotiations broke down, the Board filed a complaint through its General Counsel. The complaint charged the Company with violations of §§ 8(a)(1), 8(a)(3),[1] and 8(a)(5) of the Act.

---

[1]The § 8(a)(3) charge was withdrawn at trial.

A trial was held before an ALJ in March of 1997 and the judge issued a decision on September 29, 1998, that found against the company and in favor of the Board on nearly all counts. Thereafter, both parties filed exceptions to the ALJ's findings and Order and appealed to the National Labor Relations Board. On September 28, 2001, a three-member panel of the Board issued a decision affirming the ALJ's rulings, findings and conclusions of law (as modified) and adopted the ALJ's Order as modified.

Before this Court is the Board's petition to enforce its Order, which is based on a finding that the Company committed four major violations of the National Labor Relations Act. Specifically, the Board found: first, that the Company violated § 8(a)(5) by refusing to provide requested information to the Union; second, that the Company violated § 8(a)(5) by unilaterally changing company health benefits and wage rates; third, that the Company violated § 8(a)(5) by refusing to bargain in good faith; and fourth, that the Company violated § 8(a)(1) by informing its employees of the futility of Union representation, by soliciting employees to directly meet with company management, by informing employees that they could earn more money without Union representation, by making profane statements about the employees' Union hats, and by restricting employee travel to prevent Union activity at other company facilities.

We review appeals from the National Labor Relations Board with deference and will affirm a Board order or grant a petition to enforce an order if the Board has correctly applied the law and, on the record as a whole, there is sufficient evidence to support the order and findings. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Wright Elec., Inc. v. NLRB*, 200 F.3d 1162, 1166 (8th Cir. 2000). We consider Hardesty's violations of the National Labor Relations Act in turn.

## I. Company's § 8(a)(5) Violations–Refusing to Provide Information

Hardesty alleges that the Board erred when it found that the Company violated § 8(a)(5) by refusing to provide information regarding the wage rate of a driver it recently promoted to a supervisory position and for refusing to provide a list of applicants for a truck-driver position it declined to fill with a Union member. We disagree.

When requested, an employer must provide a union with information that is necessary and relevant to the union's role as the employees' collective bargaining representative. *See NLRB v. Acme Indus.* Co., 385 U.S. 432, 435-36 (1967). In *NLRB v. Acme Industrial*, the Supreme Court observed that the relevance of information to a union's role as the employees' collective bargaining representative was to be determined on a broad "discovery-type standard." *Id*. at 437; *see also Brown Shoe Co. v. NLRB*, 33 F.3d 1019, 1022 (8th Cir. 1994) ("the standard of relevancy is a liberal one, similar to that used for discovery purposes."). Under this liberal standard, we think that both requests were relevant and that there was sufficient evidence to support the Board's finding that the Company's refusal to provide the information was a § 8(a)(5) violation.

With respect to the Union's request for the recently-promoted driver's wage rate, Hardesty avers that, in the first instance, it never received the request, which was sent by facsimile (fax), and, in the second instance, the employee in question was no longer a member of the unit represented by the Union. We decline the invitation to overturn the ALJ's determination that the confirmation report from the Union's fax machine created a presumption that the fax was received by the Company and that the Company failed to rebut that presumption. Moreover, we agree that the relevancy of the driver's wage rate to the negotiations turns not on the fact that the driver was promoted out of the unit, but rather on the fact that he was at one point a member of

the unit. As a member of the unit during negotiations, his wage rate was relevant and the Company violated § 8(a)(5) when it refused to turn over this information.

As for the Company's failure to provide the applicant list for a truck-driver position that it declined to fill with a Union member, Hardesty disputes the relevance of the information on three grounds. First, the Company argues that the Union member whose unsuccessful application triggered the request never became a member of the bargaining unit, somehow making the information irrelevant. Next, the Company argues that the request for information is somehow moot because the allegation that the Company discriminated against the Union member in question was withdrawn at trial. Finally, the Company argues that we should adopt the Third Circuit's rule that a union must first articulate a reasonable basis for believing that discrimination has occurred before a company must turn over information. *See Hertz Corp. v. NLRB*, 105 F.3d 868, 873 (3d Cir. 1996).[2]

The employer's duty to produce information sought by a union turns on the likelihood that the request, if granted, would produce information relevant and necessary to the union's role as the employee's collective bargaining agent. *Acme Indus.*, 385 U.S. at 435-36. We agree that neither the fact that a job applicant did not become a member of the bargaining unit, nor the fact that the request for information was initiated because the Union felt that the company declined to hire the applicant because he was wearing a Union hat during the interview, make the information irrelevant and we decline to overturn the Board's findings on these points. Further, the fact that the § 8(a)(3) charge of discrimination in hiring was withdrawn at trial

[2]We agree with the Board that even under the standard used by the Third Circuit in *Hertz Corp.*, the Union articulated a reasonable basis for believing that discrimination had occurred when it alleged in its letter requesting the information that "Brother Hixson is over 40 years of age and was wearing a Teamster cap when he filled out the application. We feel these are the reasons he was not considered for one of the three positions that have been filled." (Gov. Ex. 24; App. at 673.)

does not moot or otherwise eliminate an employer's preexisting duty to turn over the information. Rather, an employer's duty depends on whether the information is necessary and relevant to the union's role as the employees' collective bargaining representative. *See id.* We find sufficient evidence in the record before us to uphold the Board's finding that Hardesty violated § 8(a)(5) when it refused to provide the Union with the requested information.

## II. § 8(a)(5) Violations–Unilateral Changes

It is a violation of the employer's duty to bargain in good faith to unilaterally change the conditions of employment presently under negotiation. *See NLRB v. Katz*, 369 U.S. 736, 743 (1962); *Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1381 (8th Cir. 1993). Such action by the employer "is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." *Katz*, 369 U.S. at 743. Health insurance coverage was under negotiation in the instant case and Hardesty does not dispute that it unilaterally changed the insurance plan covering its employees.[3] Instead, the Company argues, first, that the switch in the insurance plan did not affect the status quo and, second, that even if the change affected the status quo, the Union agreed to the change during negotiations.[4]

---

[3]By not presenting the issue to this Court, Hardesty has waived any claim that it violated § 8(a)(5) by unilaterally changing the wage rates of two unit employees.

[4]We pause to note that Hardesty has not itself claimed that this is a case in which a company's unilateral change did not violate § 8(a)(5) because it was automatic or non-discretionary. *See Katz*, 369 U.S. at 747; *Radisson Plaza Minneapolis*, 987 F.3d at 1381. Thus, we have no occasion to decide whether, in an era of rapidly rising health-care costs, an employer's decision to change insurance plans could fit within the exception noted by the Supreme Court in *Katz* and this Court in *Radisson Plaza*.

The Board correctly determined that the Company's change in insurance plans was a violation of § 8(a)(5) and we will not overturn its finding that the Union did not agree to the changes. On June 11, 1996, when the Company announced to the Union that it had changed plans effective June 1, the contract provisions relating to health insurance were still under discussion and the parties had widely differing positions. The Company's contention that the change of the insurance plan did not affect the status quo, which it argues was merely the right of the unit employees to participate in the company-wide plan, largely misses the point. Were the status quo the *only* issue that § 8(a)(5) addressed, we might agree with the Company and end our inquiry here. Undeniably, the status quo is part of what § 8(a)(5) is concerned with. However, in this case even the status quo was not preserved for the Company does not dispute the fact that the new plan increased the employees' out-of-pocket expenses and changed the specifics of coverage. Still, the status quo is only part of the issue.

Section 8(a)(5)'s prohibition on unilateral employer action is multifaceted. On the one hand, § 8(a)(5) forbids an employer from making unilateral changes in the conditions of employment in order to preserve the status quo. Intuitively, if the employer engages in unilateral action, there may be nothing left for the parties to negotiate about and § 8(a)(5) would thus be violated. On the other hand, § 8(a)(5)'s prohibition is also literal. Section 8(a)(5) makes it illegal for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Quite simply, the employer must bargain with the union about changes it wishes to make. Thus,

> [u]nilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance.

*Katz*, 369 U.S. at 747. Such unilateral action will also often send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them. Preserving the status quo, therefore, is only one reason for the prohibition on unilateral employer action regarding conditions of employment and the Board correctly determined that Hardesty's unilateral actions violated § 8(a)(5).

### III.  Surface Bargaining–Hardesty's Bargaining Behavior and § 8(a)(1) Violations

The nub of this case is the Board's finding that Hardesty refused to bargain collectively with the Union in violation of § 8(a)(5) by engaging in a course of conduct that amounted to surface bargaining. As noted, § 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 8(d) of the Act further defines the duty to bargain collectively and it requires that the parties "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder." 29 U.S.C. § 158(d). The Act specifically notes that the "obligation [to bargain in good faith] does not compel either party to agree to a proposal or require the making of a concession." *Id.* However, where an employer "conduct[s] negotiations 'as a kind of charade or sham, all the while intending to avoid reaching an agreement . . .'" that employer violates § 8(a)(5) by engaging in surface bargaining. *Radisson Plaza*, 987 F.2d at 1381 (quoting *Continental Ins. Co. v. NLRB*, 495 F.2d 44, 48 (2d Cir. 1971)).

When determining whether an employer failed to bargain in good faith, we examine "the employer's conduct in the totality of the circumstances in which the bargaining took place." *Id.* (citing *NLRB v. Billion Motors, Inc.*, 700 F.2d 454, 456 (8th Cir. 1983)). Importantly, we have observed that because away-from-the-table

conduct may shed light on the employer's course of conduct, "[t]he Board not only looks to the employer's behavior at the bargaining table but also to its conduct away from the table that may affect the negotiations." *Id.* (quoting *NLRB v. Billion Motors, Inc.*, 700 F.2d 454, 456 (8th Cir. 1983)). As was the case in *Radisson Plaza*, the Board in this instance based its determination that the Company violated § 8(a)(5) on both the Company's away-from-the-table § 8(a)(1) behavior and its course of conduct during negotiations.

We agree that the Company's away-from-the-table § 8(a)(1) violations and its regressive and largely unexplained bargaining positions amount to sufficient evidence to support the Board's findings that Hardesty violated § 8(a)(5). In essence, the Board found, and we agree, that there is sufficient evidence in the record as a whole to support the finding that the Company's plan was to wait one year and hold a decertification election pursuant to § 9(c). We consider the Company's bargaining behavior and § 8(a)(1) violations seriatim.

*A. Bargaining Behavior At the Table*

This case does not present the question of whether a company's steadfast insistence on initial proposals that, if accepted, would have resulted in the employees receiving lower pay and fewer benefits than they received before the union's arrival might be sufficient evidence of bad-faith bargaining to support a § 8(a)(5) violation. It is well established that under the National Labor Relations Act an "employer is under a duty to enter into sincere, good faith negotiations with the constituted representative of the employees, with an intent to settle the differences and arrive at an agreement." *NLRB v. Wonder State Mfg. Co.*, 344 F.2d 210, 215 (8th Cir. 1965). The Act, however, does not impose any duty to actually reach an agreement and does not prevent a party from insisting in good faith on any particular bargaining position. In the instant case, the Board found that Hardesty's bargaining behavior was not above board. The record shows that the parties easily reached agreement on a number

of issues and that the negotiations proceeded smoothly for several months until Hardesty withdrew some of its initial proposals (e.g., vacation) and thereafter introduced regressive proposals on other issues, proposing the elimination of overtime (which averaged ten hours per week, per employee in the unit), bonuses, and the 401(k) plan. Of itself, such hard-bargaining might not amount to an § 8(a)(5) violation, especially if the Company provided compelling explanations for its proposals. However, in this case, the Board found that the explanation for Hardesty's bargaining positions were not to be found in the Company's somewhat perfunctory statements. Rather, the explanation for the Company's course of conduct was provided by the Company's away-from-the-table behavior, consisting mostly of statements by supervisors concerning the Company's preferred method of dealing with the Union. Given the evidence of record, we cannot say that the Board erred in concluding that Hardesty had no intention of reaching an agreement, that its plan was to wait until a decertification vote might be had in order to get rid of the Union, and that its bargaining behavior was part-and-parcel of this plan.

## B. Company's Away-From-the-Table § 8(a)(1) Violations

In this case, there is no question that the § 8(a)(1) violations, which consist largely of statements made by supervisors and managers in Hardesty's Fort Smith and Van Buren facilities, in fact occurred. Rather, the Company argues that these statements concerning the effectiveness of the Union, the potential benefits of the Union representation, the Company's strategy for dealing with the Union, the Company's desire to resolve employee concerns without the Union, and the obscene descriptions of the employees' Union hats were the personal opinions of the supervisors (who did not participate in the negotiations) and are not attributable to the

Company. Moreover, the Company asserts that the Board erred when it considered these statements in tandem with the Company's negotiation behavior.[5]

Taken alone, isolated utterances from supervisors and managers *might* not be attributable to a company as a whole. Yet, in this case, the Board determined that these statements reasonably indicated the Company's intent to wait a year and seek decertification and the Board properly attributed them to the Company as evidence of Hardesty's plan to deal with the Union. For instance, supervisor Bill Lincks stated at the start of negotiations in October, 1995, that "[t]he Union would be there one year." (Trial Tr. at 251.) Later, in April, 1996, when the Company had introduced its regressive proposals, another supervisor, Gary Lincks, stated that "within a year the whole thing would be over with and they'd probably have a new vote." (Trial Tr. at 279-80.) Towards the end of April, 1996, Bill Lincks also told another employee that "I'm going to appoint you supervisor, that way you won't be able to vote next

---

[5]We think the Company's recourse to language found in the Board's opinion in *Litton System*, 300 N.L.R.B. 324 (1990), *enforced*, 949 F.2d 249 (8th Cir. 1991), *cert. denied*, 503 U.S. 985 (1992), entirely inapposite. In that case, the Board overturned an ALJ's finding that the company engaged in surface bargaining in violation of § 8(a)(5) as being unsupported in the record as a whole. When making that determination, the Board examined the company's course of conduct at the bargaining table *and* the company's away-from-the-table actions, including its § 8(a)(1) violations. The Board determined that, "although the Respondent engaged in some acts of misconduct away from the bargaining table, we conclude that this does not warrant a finding of overall bad-faith bargaining." *Id*. at 330. The company's two § 8(a)(1) violations that the Board sustained were not sufficiently connected to the Company's negotiating behavior and the Board noted that, "although the Respondent violated Section 8(a)(5) and (1) by making unilateral changes in its rule on employee meetings in the cafeteria and on the patio, and its practice of providing an extra half hour for lunch the day before Christmas, there is no evidence that these issues were linked to the ongoing negotiations in such a way as to frustrate the reaching of an agreement." *Id*. Here, there was sufficient evidence for the Board to conclude that Hardesty's § 8(a)(1) violations, concerning as they did the Company's intended course of conduct towards the Union, were linked to the negotiations.

time." (Trial Tr. at 247.) When asked when the next vote would occur, Lincks stated that it would happen "about the same time it did last year." (Trial Tr. at 247.) Around that same time, Gary Lincks told another employee that "it would be to the Company's benefit not to enter into a contract with the Union. The main reason being that it would cost them money and that they would and could wait until all the Union supporters were gone and then they'd have everything their own way." (Trial Tr. at 10.) Gary Lincks also noted that "it wouldn't do us any good to negotiate with the Company because they'll just . . . wait till another election." (Trial Tr. at 10.) On or about September 5, 1996, near the end of negotiations, Bill Lincks stated that "I don't understand why they need both of you [i.e., two unit employees who regularly sat at the negotiating table] all there . . . you're going to accomplish the same thing you've always accomplished, which is absolutely zero." (Trial Tr. at 254.) In addition, the Board found that these supervisors made an attempt to circumvent the Union and have the Company president meet with the unit employees directly to resolve outstanding issues. (Trial Tr. at 281-83.) The Board also found that during the summer of 1996, Bill Lincks told one employee that Union membership was useless because "if we hadn't a joined we [would] have done had $10.00 an hour and done had new trucks." (Trial Tr. at 255.) Finally, the Board found that on May 2, 1996, Bill and Gary Lincks made obscene and profane references to the Union hats that several unit employees were wearing.[6] (Trial Tr. at 280-81.)

The Board properly considered these statements in conjunction with the Company's regressive and largely unexplained bargaining behavior. These statements, occurring as they do in proximity to the Company's proposal to eliminate overtime and reduce vacation benefits, and the Company's decision to unilaterally change health benefits, shed light on what might otherwise merely be hard bargaining

---

[6]The Board also found that in May or June of 1996, the Company prevented their drivers from traveling to another facility at which they would ordinarily have helped at "because we [the drivers] were . . . trying to recruit the Winslow drivers into the union." (Trial Tr. at 252.)

and isolated § 8(a)(1) violations.  This case then is analogous to *Radisson Plaza* where we held that "the Board properly found that Radisson's conduct away from the bargaining table supported an inference that Radisson failed to bargain in good faith." *Radisson Plaza*, 987 F.3d at 1382.  As was the case in *Radisson Plaza*, the Board in this case found sufficient evidence to conclude that Hardesty "treated the union[] as irrelevant with respect to issues of vital significance, including wage and schedule changes, and then refused to provide the union[] with basic information concerning unit employees." *Id*.  Based on the record before us, the Board properly found that Hardesty violated § 8(a)(5) by refusing to bargain in good faith.

## IV. Conclusion

There being substantial evidence in the record as a whole to support the Board's decision, we grant enforcement of the Board's order.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.