# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2188
_____

National Labor Relations Board

*Petitioner*

United Food & Commercial Workers' Union, Local No. 293

*Intervenor*

v.

Noah's Ark Processors, LLC, doing business as WR Reserve

*Respondent*
_____

Petition to Enforce an Order of
the National Labor Relations Board
_____

Submitted: December 15, 2021
Filed: April 22, 2022
_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.
_____

LOKEN, Circuit Judge.

Noah's Ark Processors, LLC ("Noah's Ark"), is a limited liability company that purchased meat processing facilities in Hastings, Nebraska in 2015. After the purchase, Noah's Ark continued to operate the facilities under a five-year collective

bargaining agreement ("CBA") with United Food and Commercial Workers Local Union No. 293 (the "Union"), representing a largely Spanish speaking 250-300 employee bargaining unit. The CBA expired in January 2018 with the parties engaged in what became lengthy, unsuccessful negotiations for a new contract. The Union filed an unfair labor practice charge in March 2018 alleging failure to bargain in good faith. That charge was settled in June, but the Union filed a new charge in July, and additional charges in the ensuing months, alleging failure to bargain in good faith and other unlawful anti-Union activities. The General Counsel of the National Labor Relations Board (the "Board") filed a Complaint, and the consolidated charges were tried before an Administrative Law Judge ("ALJ") in March 2019.

Largely adopting the ALJ's findings, the Board entered an order that Noah's Ark committed multiple unfair labor practice violations of Sections 8(a)(1) and (5) of the National Labor Relations Act (the "NLRA"), 29 U.S.C. §§ 158(a)(1) and (5), including failure to bargain in good faith for a successor CBA, withholding relevant bargaining information, and unlawfully declaring an impasse and unilaterally implementing altered terms and conditions of employment.[1] With one dissenting member, the Board also concluded that Noah's Ark unlawfully threatened and terminated ten workers who engaged in an unauthorized work stoppage on March 27, 2018. The Board imposed the ALJ's recommended remedies, including a special remedy of notice reading, along with additional remedies of an affirmative bargaining

---

[1]Section 8(a)(1) declares that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7 of the NLRA. Section 7 guarantees employees "the right to self-organization, to . . . join . . . labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 8(a)(5) declares that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."

order and repayment of the union's negotiation expenses. Noah's Ark Processors, Inc. d/b/a WR Reserve, 370 N.L.R.B. No. 74 (Jan. 27, 2021).

The Board petitions to enforce its order under Section 10(e), 29 U.S.C. § 160(e). In opposition, Noah's Ark argues (i) the dissenting board member correctly concluded that the ten employees terminated for an unauthorized work stoppage were not engaged in collective activity protected by Section 7 and therefore the terminations did not violate Section 8(a)(1); (ii) Noah's Ark did not violate Section 8(a)(5) in unilaterally implementing portions of its last, best, and final offer because the parties had bargained to an impasse; and (iii) the Board imposed unwarranted extraordinary remedies, as the dissenting member concluded.[2] After petitioning for enforcement, the Board moved for temporary injunctive relief under Section 10(e). "We will enforce the Board's order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole . . . even if we might have reached a different decision on de novo review." Bolivar-Tees, Inc., 551 F.3d at 727 (quotations omitted). Applying this standard, we enforce the Board's order in full and deny the Section 10(e) motion as moot.

## I. Background

In November 2017, the Union sent Noah's Ark multiple letters requesting relevant bargaining information and attempting to schedule sessions to negotiate a successor CBA. Noah's Ark did not respond, and the existing CBA expired January 28, 2018. Noah's Ark first met with the Union in March 2018; the ten employees' unauthorized work stoppage occurred on March 27, five days later. Noah's Ark continued to withhold requested information and did not provide an initial contract

---

[2]Noah's Ark did not challenge the Board's other findings and rulings. "The Board is entitled to summary enforcement of the uncontested portions of its order." NLRB v. Bolivar-Tees, Inc., 551 F.3d 722, 727 (8th Cir. 2008) (citation omitted).

proposal until May. After informal settlement of the Union's initial unfair labor practices charge, there were intermittent meetings throughout 2018, but Noah's Ark continued to withhold information, rejected Union proposals without comment, and sent representatives who lacked decision making authority to the scheduled bargaining sessions. In January 2019, Noah's Ark presented a last, best, and final offer, declared an impasse, and unilaterally implemented its terms.

The Union ultimately filed five unfair labor practices charges, which the Board's Regional Counsel consolidated into a single amended complaint filed on February 22, 2019. With these administrative proceedings pending, the Union sued for and was granted a Section 10(j) temporary injunction to restore the status quo ante in which the district court ordered Noah's Ark to rehire the ten employees terminated after the March 2018 work stoppage. Perez v. Noah's Ark Processors, LLC, No. 4:19-CV-3016, 2019 WL 2076793 (D. Neb. May 10, 2019). The court subsequently held Noah's Ark in contempt for violating this injunction by its ongoing failure to negotiate in good faith. Sawyer v. Noah's Ark Processors, LLC, No. 4:19-CV-3016, 2019 WL 5268639 (D. Neb. Oct. 17, 2019).

After a five-day hearing, the ALJ issued a decision and recommended order, finding that Noah's Ark committed multiple Section 8(a)(1) and (5) violations including unjustifiably declaring an impasse and unilaterally implementing its final offer in January 2019. The ALJ also found the March 27, 2018 work stoppage was NLRA-protected collective activity and therefore Noah's Ark violated Section 8(a)(1) when it terminated ten participants. The ALJ recommended remedies that included orders to cease and desist from further NLRA violations, repay improperly withheld union dues, rescind the unilateral changes, and make whole the terminated employees. The ALJ also imposed an affirmative bargaining schedule of a "minimum of 24 hours per month . . . until an agreement or lawful impasse is reached or until the parties agree to a respite in bargaining," and a special remedy of a notice reading "to reassure employees" that Noah's Ark is bound by the NLRA.

-4-

A three-member panel of the NLRB affirmed most of the ALJ's findings and conclusions. The Board focused its opinion on the March 27, 2018 work stoppage, analyzing whether this "wildcat strike" was protected collective activity under the Board's decision in Silver State Disposal Service, 326 N.L.R.B. 84 (1998), an issue the ALJ did not address. Over Member Emanuel's dissent, the majority ruled this was Section 7 protected activity; thus, Noah's Ark's terminations violated Section 8(a)(1). The majority largely adopted the ALJ's remedies, including the special remedy of a notice reading, and it imposed special remedies of an affirmative bargaining order and a requirement that Noah's Ark repay the Union's negotiating expenses between March 22, 2018 and January 25, 2019. Member Emanuel dissented from the special remedies of notice reading and reimbursement of bargaining expenses.

## II. The March 27, 2018 Work Stoppage

On the morning of March 27, 2018, five days after the parties' first bargaining session, approximately twenty workers gathered in Noah's Ark's cafeteria rather than starting their shift on the production line. They asked to speak with their supervisor, seeking answers about rumors that Noah's Ark was paying newer workers higher wages than senior workers, in violation of the holdover CBA's pay scale.[3] Operations Manager Paul Hernandez met with the workers. Bilingual Union Steward Guadalupe Ortiz spoke for the workers. Hernandez told the workers "you guys either go to work,

---

[3]Rates of pay are a mandatory subject of collective bargaining. Like most mandatory subjects of bargaining, the rates of pay in an expired CBA are among "the terms and conditions of employment [that] are not subject to unilateral change [by the employer after expiration], in order to protect the statutory right to bargain." Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 206 (1991); see NLRB v. Katz, 369 U.S. 736, 743 (1962). However, of significance here, "in recognition of the statutory right to strike, no-strike clauses are excluded from the unilateral change doctrine." Litton, 501 U.S. at 199. Thus, the employees in question were not *contractually* bound not to engage in a strike or work stoppage.

leave now, or you're terminated." Some returned to work. Ten went to the parking lot, where plant manager Mike Helzer told them they could work the rest of their shift and discuss their concerns with him at the end of the day. The workers refused to return to work. Helzer threatened to call the police and Hernandez asked them to turn in their ID badges. Some workers went to the Union hall and filed a grievance, which the Union supported. Three days later, Noah's Ark submitted separation notices for the ten employees, citing voluntary resignation ("Job Abandonment") and involuntary termination ("Violation of company policy") as reasons for separation.

Citing Atlantic Scaffolding Co., 356 N.L.R.B. 835 (2011), a case involving a work stoppage by employees *not represented by a union*, as "directly on point," the ALJ found that the ten employees' "concerted work stoppage to protest wage disparities and demand increases to address the disparities" was protected activity, and therefore Noah's Ark violated Section 8(a)(1) when it threatened and then terminated them. In its exceptions to the ALJ's finding, Noah's Ark proffered three alternative arguments, two of which are briefly repeated in opposing the Board's Application to Enforce. Those two arguments require little discussion.

First, Noah's Ark argues the workers were not fired at all; they voluntarily abandoned their jobs. However, substantial evidence supports the Board's finding the workers were fired. Noah's Ark managers told the employees to go home if they would not work, required them to turn in their ID badges, and threatened to call the police if they did not leave. "It is sufficient if the words or action of the employer would logically lead a prudent person to believe his or her tenure has been terminated." Nations Rent, Inc., 342 N.L.R.B. 179, 179-80 (2004) (cleaned up), quoting NLRB v. Trumbull Asphalt Co., 327 F.3d 841, 843 (8th Cir. 1964). There is no evidence the employees intended to abandon their employment.

Second, Noah's Ark argues that, even if the employees were fired, there was no Section § 8(a)(1) violation because the Board's General Counsel failed to prove

that the terminations were motivated by protected activity (typically anti-union animus), applying the Board's test when an employer's motive is at issue. See Wright Line, 251 N.L.R.B. 1083, 1089 (1980), enforced on other grounds, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982); see generally Tschiggfrie Properties, Ltd. v. NLRB, 896 F.3d 880, 885-87 (8th Cir. 2018). We agree with the Board that, where "employees are terminated for engaging in a protected concerted work stoppage, Wright Line is not the appropriate analysis, as the existence of the 8(a)(1) violation does not turn on the employer's motive." Atlantic Scaffolding Co., 356 N.L.R.B. at 838. Discharging employees for participating in a lawful strike violates Section 8(a)(1) regardless of the employer's motive. Here, it is undisputed that the ten employees were terminated *because of* their unauthorized work stoppage.

This conclusion brings us to Noah's Ark's third argument, which is the nub of whether to enforce this portion of the Board's order -- was the unauthorized work stoppage concerted activity protected by Section 7 of the NLRA? As a general matter, the NLRA protects strikes,[4] recognizing that a strike is one collective way for employees not represented by a union to pressure their employer to bargain collectively. As the Supreme Court said in NLRB v. Insurance Agents' International Union, 361 U.S. 477, 495 (1960), "the use of economic pressure by the parties to a labor dispute . . . is part and parcel of the process of collective bargaining." Thus, if the employees in question had not been represented by the Union, their collective work stoppage to protest Noah's Ark's failure to abide by its wage rate promises in the holdover CBA would be lawful protected activity, absent violence or a contractual obligation not to strike. See, e.g., NLRB v. Wash. Aluminum Co., 370 U.S. 9 (1962) (work stoppage protesting cold work conditions protected); JCR Hotel, Inc. v. NLRB, 342 F.3d 837, 840-41 (8th Cir. 2003) (walkout to protest work conditions).

---

[4]Section 13 of the NLRA, 29 U.S.C. § 163, provides that "[n]othing in this [Act] . . . except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

In this case, however, the employees were represented by a Union that was engaged in collective bargaining for a successor CBA and which did not authorize the employees' spontaneous work stoppage. In its Brief in Support of Exceptions to the ALJ's Decision, Noah's Ark argued:

> [W]hen employees designate and join a union, the union is given the exclusive right to collectively bargain with their employer concerning the terms and conditions of work. 29 U.S.C. § 159(a). Therefore, when employees go on strike without union authorization, they are engaging in an illegal, unauthorized work stoppage under the NLRA. See Emporium Capwell Co. v. Western Addition Community Organization, 420 U.S. 50 (1975) (holding that wildcat strikers are bargaining separately and are therefore not protected by the NLRA).

In rejecting this argument, the Board majority concluded, applying its prior decision in Silver State: "Unlike in Emporium Capwell, the strikers here did not seek to circumvent the Union and bargain separately with [Noah's Ark], and the Union did not oppose the strikers' work stoppage." Dec. & Order p.2 n.8. The dissenting member argued, "my colleagues have misapplied the Silver State test." Dec. & Order p.9. Noah's Ark urges us to adopt the dissenting member's analysis.[5]

The Supreme Court's decision in Emporium Capwell confirmed that collective strikes or work stoppages by employees without their union's prior authorization must be analyzed in the context of Section 9 of the NLRA, which provides that a

---

[5]We reject as clearly contrary to the administrative record the Board's assertion that Noah's Ark failed to preserve this issue under Section 10(e). Its Exceptions to the ALJ's decision relied on Emporium Capwell to argue the work stoppage was unprotected by Section 7. The Board responded to this argument with an analysis based on its Silver State decision, which the General Counsel *had not even cited* in responding to the Exceptions. Noah's Ark plainly "apprised the Board that it intended to press the question now presented to us." NLRB v. Monson Trucking, Inc., 204 F.3d 822, 826 (8th Cir. 2000) (cleaned up).

properly-elected union serves as the "exclusive representative[]" of the employees in negotiating the terms and conditions of employment. 29 U.S.C. § 159(a). In Emporium Capwell, a group of unionized department store workers picketed the store, demanding to bargain with their employer regarding issues of racial discrimination the union preferred to address through CBA grievance procedures. The union's secretary-treasurer urged the employees to rely on the grievance process, and the employer warned the employees they might be fired if their picketing and public statements continued. When the employees repeated these activities, two were fired. 420 U.S. at 52-56. The Board's General Counsel filed a Section 8(a)(1) complaint, which the Board rejected, concluding the employees actions were not concerted activity protected by Section 7 because "protection of such an attempt to bargain would undermine the statutory system of bargaining through an exclusive, elected representative." Id. at 58. The court of appeals reversed because "concerted activity directed against racial discrimination enjoys a 'unique status' by virtue of" Title VII of the Civil Rights Act of 1964. Id.

The Supreme Court reversed the court of appeals. It first noted that the rights guaranteed by Section 7 are collective rights, "protected not for their own sake but as an instrument of the national labor policy of minimizing industrial strife by encouraging the practice and procedure of collective bargaining." Id. at 62 (quotations omitted). Both the employer and the union as exclusive bargaining representative "have strong and legitimate objections to bargaining on several fronts over the implementation of the right to be free of [racial] discrimination." Id. at 70. Accordingly, the dissident employees' actions demanding to bargain separately from their union were not protected by Section 7, and their termination did not violate Section 8(a)(1).

In the nearly fifty years since Emporium Capwell was decided, the Board and reviewing courts have agreed that decision did not "strip the NLRA's protection from all wildcat strikes." CC1 Ltd. P'ship v. NLRB, 898 F.3d 26, 34 (D.C. Cir. 2018).

Rather, a case-by-case analysis is needed to determine whether a particular concerted work stoppage is protected by Section 7. See, e.g., E. Chicago Rehab. Ctr., Inc. v. NLRB, 710 F.2d 397, 400-03 (7th Cir. 1983), cert. denied, 465 U.S. 1065 (1984); NLRB v. Bridgeport Ambulance Serv., 966 F.2d 725, 729 (2d Cir. 1992). The Board addressed this issue in Silver State, though only the concurring member discussed Emporium Capwell in detail. 326 N.L.R.B. at 85 n.8, 103-104. Silver State involved a work stoppage that allegedly violated the no-strike clause of an unexpired CBA, but its analysis has been extended to other contexts, including unauthorized work stoppages. See, e.g., CC1 Ltd. P'ship, 898 F.3d at 30.

In Silver State, the employer terminated a garbage truck driver who had served as president of an employee committee that picketed the employer's headquarters to demonstrate dissatisfaction with the employer and their union. A few days later, the truck driver arrived to pick up his last paycheck and began speaking about his termination. A crowd of employees gathered outside the facility, refused to begin their shift, and gathered in a nearby vacant lot when police arrived and directed them to leave the facility. When a supervisor appealed to them to return to work, the employees attempted to comply but were turned away by the employer's security staff; 71 were then terminated for an unauthorized work stoppage. The employees grieved their termination; the union met with the employer to urge their reinstatement.

After a hearing, the ALJ concluded that Emporium Capwell did not apply because, while the committee's earlier picketing was inconsistent with the union's exclusive representation, the later work stoppage was "exclusively related to the termination of Crockett and the processing of his grievance." 326 NLRB at 104. The ALJ found the work stoppage unprotected under the CBA's no-strike clause but condoned by the employer. Therefore, the termination violated Section 8(a)(1). Reaching the same result by a different path, the Board found that the employer "has not established that the work stoppage violated the no-strike clause" and therefore "the employees did not lose the protection of the Act." Id. at 85. The panel majority

adopted the ALJ's <u>Emporium Capwell</u> analysis in a footnote. <u>Id.</u> at 85 n.8. Chairman Gould, concurring, addressed this issue at length:

> [Prior Board decisions] proceed on the assumption that, if there is an identity or similarity of objectives between the union and individual employees, an unauthorized stoppage is protected under the Act. . . . This approach . . . is both naive and misguided.
>
>       *    *    *    *    *
>
> [T]he fact of the matter is that, generally speaking, union and employee goals . . . both before and during negotiations and indeed right through the 11th hour, are going to be nearly identical if not synonymous. Both . . . want to improve the living standards and protect the job security of the employees. This is as it should be.
>
>       *    *    *    *    *
>
> [T]he Board should discard the thesis that disagreement or agreement about the substantive goals of the strike is relevant to the protected status of the workers conduct. The key consideration in determining whether the worker's conduct undermines or derogates the exclusive bargaining representative concept is whether there is some consistency or accord between the union and the strikers on the question of strategy and timing.
>
>       *    *    *    *    *
>
> [I]t is consensus about strategy that the Board should look to, not identity of substantive goals as it has in the past. . . . If, for instance, a union wants to delay use of the strike weapon to a time that it deems to be more propitious, it is hard to imagine something that is more inconsistent with the exclusivity concept than a strike at another time. Yet, under the Board's present approach, so long as identity of substantive goals is found to exist, the activity is protected. This approach creates havoc with union policy, good industrial relations, and

-11-

the sound administration of our Act . . . .  And it promotes the balkanization with which <u>Emporium</u> is at war.

<u>Id.</u> at 89-90.

Unfortunately, the Board has not followed Chairman Gould's sound advice regarding the Supreme Court's controlling interpretation of the relationship between Section 7, Section 8(a)(1), and Section 9(a) in <u>Emporium Capwell</u>.  In this case, for example, both the panel majority and dissent stated that the Board determines whether an unauthorized work stoppage is protected "by considering (1) whether the employees were attempting to bypass their union and bargain directly with the employer, and (2) whether the employees' position was inconsistent with the union's position."  Dec. & Order p.2.[6]  Here, the ten employees questioned management whether Noah's Ark was complying with terms and conditions of the holdover CBA.  Without question, as Chairman Gould explained, the Union would share the employees' substantive position on this issue.  Indeed, the Union's duty as exclusive representative arguably required it to pursue the employees' position, by grievance or otherwise.  Thus, if the Board had held that the employees' work stoppage was protected concerted activity *merely because* it was not inconsistent with the Union's unstated position on this issue, we would decline to enforce this part of the Board's order as inconsistent with the Supreme Court's decision in <u>Emporium Capwell</u>.

But the Board did not decide the protected activity issue on this narrow basis.  It ruled that the work stoppage was not unprotected primarily because Noah's Ark

---

[6]As Member Emmanuel noted, questions remain whether the <u>Silver State</u> analysis is consistent with <u>Emporium Capwell</u>.  <u>See</u> <u>CC 1 Ltd. P'ship</u>, 368 N.L.R.B. No. 84, slip. op. at 3 fn. 6 (2019).  At oral argument, counsel for the Board stated that the Board is now focusing more on that Supreme Court interpretation of the NLRA. <u>Cf.</u> <u>MikLin Enterprises, Inc. v. NLRB</u>, 861 F.3d 812, 823-24 (8th Cir. 2017) (en banc).

"has not proven that the ten employees attempted to circumvent their union and bargain directly with the employer." Dec. & Order p.3. Substantial evidence in the administrative record supports this finding. There is no direct evidence the work stoppage was an attempt to bypass the Union and negotiate directly with Noah's Ark. Indeed, the employees rejected the plant manager's offer to meet and discuss the issue after work that day. The workers were not trying to bargain for terms separate from the Union's negotiation; rather, the work stoppage was an attempt to enforce seniority pay provisions the Union previously negotiated in the holdover CBA.

In dissent, Member Emanuel interpreted this event as evidence the workers "wanted to discuss wages right then and there, at a time when a responsible union official was absent." Dec. & Order p.10. But given how quickly the events of March 27 escalated after the workers informally sought answers to their being fired, and given the union steward's lack of authority to commence the grievance process while serving as their interpreter, the employees' actions show understandable impatience but not a demand or even a desire to take over the Union's exclusive bargaining authority. The events on March 27 are analogous to the circumstances in Silver State, where a "brief and spontaneous, concerted work stoppage" quickly escalated when the employer called the police and then terminated the employees instead of allowing them to return to work. Silver State, 326 N.L.R.B. at 84-87. The dissenting Member reasoned that because formal negotiations had just begun, the goals of the work stoppage could not be consistent with a Union position that did not yet exist. We agree that is a relevant factor. But Noah's Ark's bargaining intransigence and failure to share relevant information had delayed negotiations for a successor CBA. More significantly, the employees on March 27 questioned Noah's Ark's compliance with the holdover CBA, not what was being bargained for the future. That was a subject for a grievance, which the Union immediately commenced.

In other cases applying Emporium Capwell and Silver State, the Board and reviewing courts have taken a similarly fact-intensive approach in determining

whether unauthorized concerted activities that would otherwise be protected lost that protection because they interfered or were inconsistent with their union's right of exclusive representation. See Bridgeport Ambulance Serv., 966 F.2d at 729 (protected walkout protesting work conditions and a discharge "did not denigrate the Union's role as collective bargaining representative"); E. Chicago Rehab. Ctr., 710 F.2d at 399-400 (walkout protesting unilateral change to lunch breaks protected even though union actively negotiating the issue); Dreis & Krump Mfg. Co. Inc. v. NLRB, 544 F.2d 320, 325-27 (7th Cir. 1976) (protected independent leafletting activity sought "not to disparage the established [grievance] procedure but to enhance it"); NLRB v. A. Lasaponara & Sons, Inc., 541 F.2d 992, 998-99 (2d Cir. 1976) (one-day strike protesting Palm Sunday work schedule not an attempt to bypass the union), cert. denied, 430 U.S. 914 (1977); Industrial Hard Chrome, Ltd., 352 N.L.R.B. 298, 310-11 (2008) (protected work stoppage protesting supervisor's mistreatment not an attempt to bypass the union or engage in direct bargaining); United Cable Television Corp., 299 N.L.R.B. 138, 142-43 (1990) (letter to employees advocating higher wages did not seek to usurp or replace the union).

After careful review of the record on this issue, we agree with the Board majority that Noah's Ark failed to establish that the Union's Section 9(a) right to be the ten employees' exclusive bargaining representative made their spontaneous work stoppage -- a concerted attempt to question their terms and conditions of employment -- unprotected activity under Emporium Capwell. As Judge Gerrard aptly summarized this issue in Perez, "having done everything it could to marginalize the Union, Noah's Ark shouldn't be allowed to rely on the Union's survival to justify firing employees who would otherwise have clearly been engaged in concerted activity protected by § 7." 2019 WL 2076793 at *8. Accordingly, we enforce the Board's determination that Noah's Ark violated Section 8(a)(1) when it terminated the ten employees.

-14-

### III. The Impasse and Unilateral Implementation Issue

On January 30, 2019, a year after expiration of the holdover CBA, Noah's Ark declared a bargaining impasse and unilaterally implemented its last, best, and final offer. Changes included removing maintenance employees from the bargaining unit, eliminating dues check offs and safety inspections, and limiting Union access. "[W]hen the parties have bargained to an impasse, the employer may unilaterally change terms and conditions of employ, so long as these changes are consistent with offers that the union has rejected." United Paperworkers Int'l Union v. Champion Int'l Corp., 81 F.3d 798, 802 (8th Cir. 1996). Based on its finding of overall bad faith bargaining, the ALJ found, and the Board agreed, that Noah's Ark violated Section 8(a)(1) and (5) by unlawfully declaring an impasse and unilaterally modifying the terms and conditions of employment. Noah's Ark appeals the Board's determination that the parties had not negotiated to an impasse when it implemented its last best offer. We review whether substantial evidence supports the Board's finding that Noah's Ark did not negotiate to a valid impasse. NLRB v. Whitesell Corp., 638 F.3d 883, 890 (8th Cir. 2011).

Though "impasse" is an often-used word whose meaning is commonly understood, in this context it is an imprecise term of art. "Given the many factors commonly itemized by the Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a 'state of facts in which the parties, despite the best of faith, are simply deadlocked.'" Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 543 n.5 (1988), quoting R. Gorman, Basic Text on Labor Law: Unionization and Collective Bargaining 448 (1976). However, because unilateral implementation "is a circumvention of the [NLRA] duty to negotiate," Katz, 369 U.S. at 743, one factor is a prerequisite to a finding of impasse -- "An impasse presupposes a reasonable effort at goodfaith bargaining." Public Serv. Co. of Okla. v. NLRB, 318 F.3d 1173, 1180 (10th Cir. 2003) (quotation omitted). Noah's Ark did not satisfy this prerequisite.

The ALJ's findings recounted Noah's Ark's intransigence throughout the negotiation process, as did Judge Gerrard's opinion in Perez, 2019 WL 2076793 at *1-4. Noah's Ark failed to respond to the Union's repeated requests for relevant bargaining, arrived at the first meeting in March 2018 empty handed, and finally submitted its first proposal on May 15, which included the above-referenced changes it unilaterally implemented in January 2019. In the interim, after the parties' informal settlement of the Union's initial unfair labor practice complaint, Noah's Ark sent an administrative assistant to the first bargaining session who admitted, "I don't know why I am here. I don't know why they sent me. I can't make any decisions." During the rest of 2018, Noah's Ark cancelled multiple sessions on short notice. The sessions that did take place were brief and ineffective, with the administrative assistant repeatedly rejecting Union proposals and counterproposals without comment. After this persistent refusal to engage in meaningful negotiations, Noah's Ark presented its last, best, and final offer on January 2, 2019, which lacked a wage term and did not include minor changes that had been agreed upon during previous sessions. The Union's request for additional information was rebuffed. On January 30, Noah's Ark notified the Union it was declaring an impasse and implementing the offer in its entirety.

After reviewing this bargaining history, Judge Gerrard concluded: "Having refused to bargain in good faith, Noah's Ark could hardly conclude that actually bargaining in good faith would be futile." Perez, 2019 WL 2076793, at *12. We agree. Substantial evidence clearly supports the Board's finding that Noah's Ark did not declare a *valid* impasse and therefore unilateral implementation of its last, best, and final offer violated Sections 8(a)(1) and (5).

## IV. The Special Remedies Issue

Finally, Noah's Ark appeals the Board's special remedies of notice reading and reimbursement of negotiation expenses, extraordinary remedies to which Member

-16-

Emanuel dissented. This contention is without merit. The Board has broad discretionary power under Section 10(c) to devise remedies to effectuate the policies of the NLRA. 29 U.S.C. § 160(c). Its remedial order "will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate" those policies. Fibreboard Paper Prod. Corp. v. NLRB, 379 U.S. 203, 216 (1964) (quotation omitted).

Here, the Board majority concluded that Noah's Ark's "substantial unfair labor practices have infected the core of the bargaining process to such an extent that traditional remedies will not eliminate their effects." Dec. & Order p.5. The dissent agreed that Noah's Ark "conducted itself dismally with respect to its duty to bargain in good faith" but concluded the extraordinary remedies were not warranted. Dec. & Order p.10. The remedies in question are not beyond those that have been imposed in other extreme cases. See North Memorial Health Care, 364 N.L.R.B. No. 61, slip op. at 1 (2016) (public notice reading), enforced in relevant part, 860 F.3d 639 (8th Cir. 2017); Camelot Terrace, Inc. v. NLRB, 824 F.3d 1085, 1095 (D.C. Cir. 2016) (reimbursement of bargaining expenses). The Board did not abuse its substantial discretion or exceed its remedial authority by imposing these extraordinary remedies.

Moreover, Noah's Ark did not preserve these issues by challenging the special remedies before the Board, either in its objections to the ALJ's recommended remedies, or by a motion for reconsideration when the Board *sua sponte* added the reimbursement remedy. As the Third Circuit held in upholding special remedies in a similar case:

> We hold that under the egregious facts of this case involving a recidivist employer, all of these remedial orders come within the broad discretionary authority of the Board. . . . The various additional remedies specifically ordered *sua sponte* by the Board . . . were not

-17-

challenged before the Board . . . and therefore, under Section 10(e), 29 U.S.C. § 160(e), may not be challenged before this court.

United Dairy Farmers Co-op Ass'n v. NLRB, 633 F.2d 1054, 1064 (3d Cir. 1980).[7]

## V. Conclusion

For the foregoing reasons, we grant enforcement of the Board's Decision and Order of January 27, 2021. See § 160(e). The Board's motion for temporary injunctive relief under § 10(e) is dismissed as moot.

STRAS, Circuit Judge, concurring in part and concurring in the judgment.

I concur in all but Part IV of the court's opinion. In my view, we have no business deciding whether the notice-reading and reimbursement remedies "effectuate the policies of the NLRA" when Noah's Ark did not challenge either before the Board. *Ante*, at 17; *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982) (holding that "the Court of Appeals lack[ed] jurisdiction to review objections that were not urged before the Board"); *NLRB v. Monson Trucking, Inc.*, 204 F.3d 822, 825 (8th Cir. 2000) (explaining that § 10(e) of the National Labor Relations Act limits "[o]ur jurisdiction").

_____

_____

[7]In response to the concurring opinion of Judge Stras, the plain language of Section 10(e) gives a court of appeals jurisdiction to determine whether "extraordinary circumstances" excuse a party's failure to urge its objections before the Board. Thus, we do not read the Supreme Court's reference to "jurisdiction" in Woelke & Romero Framing, Inc. v. NLRB 456 U.S. 645, 665 (1982), to mean that we lack Article III jurisdiction to consider special remedies issues. The opinion in Woelke goes on to state that "judicial review is barred by § 10(e) of the Act." In other words, these issues were not properly preserved for appeal.