# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1895
_____

National Labor Relations Board

*Petitioner*

United Food & Commercial Workers' Union, Local No. 293

*Intervenor*

v.

Noah's Ark Processors, LLC, doing business as WR Reserve

*Respondent*
_____

National Labor Relations Board
_____

Submitted: December 12, 2023
Filed: April 8, 2024
_____

Before ERICKSON, MELLOY, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

The National Labor Relations Board concluded that Noah's Ark Processors, LLC, acted unfairly when it refused to bargain in good faith and unilaterally implemented a new collective-bargaining agreement. Although Noah's Ark

challenges the Board's findings and the remedies it imposed, we grant enforcement of its order.

I.

Once the previous collective-bargaining agreement expired, Noah's Ark and the local chapter of the United Food and Commercial Workers' Union began negotiations on a new one. *See NLRB v. Noah's Ark Processors, LLC* (*Noah's Ark I*), 31 F.4th 1097, 1101 (8th Cir. 2022). Although the union sent its president, the company's representative was an administrative assistant who had no decision-making authority. *See id.* at 1108. After "brief and ineffective" negotiations, Noah's Ark extended a final offer that "did not include minor changes that had been agreed upon during previous sessions." *Id.* Unsurprisingly, the parties did not reach an agreement. *See id.*

Frustrated with these tactics, the union filed charges with the Board. While it was considering them, the Board filed a petition against Noah's Ark in federal district court for injunctive relief. *See Perez v. Noah's Ark Processors, LLC*, No. 4:19-CV-3016, 2019 WL 2076793, at *1 (D. Neb. May 10, 2019); 29 U.S.C. § 160(j) (allowing the Board to seek "temporary relief or [a] restraining order" after it receives an unfair-labor-practices charge). The court granted the injunction and ordered the company to return to the negotiating table. *See Perez*, 2019 WL 2076793, at *1, *14.

Noah's Ark did so, but only for long enough to inform the union that the company "was unwilling to negotiate" and to present another final offer. *Sawyer v. Noah's Ark Processors, LLC*, No. 4:19-CV-3016, 2019 WL 5268639, at *3 (D. Neb. Oct. 17, 2019). At that point, the district court issued a contempt finding, *see id.* at *8, and the Board determined that Noah's Ark had failed "to bargain in good faith," *Noah's Ark Processors, LLC*, 370 N.L.R.B. No. 74, at 4, 2021 WL 308783, at *3 (Jan. 27, 2021). We enforced the Board's order, including the requirement that the company keep negotiating with the union. *See Noah's Ark I*, 31 F.4th at 1109.

The parties met seven more times over the next two months, but the renewed negotiations did not get off to a good start. The company's opening offer proposed eliminating binding arbitration for labor grievances, subcontracting "existing operations," cutting vacation days, and limiting holiday pay, which were steps back from what the parties had discussed before. The union refused to accept the company's "regressive" offer.

The parties made little headway over the next five meetings. Noah's Ark gave in on a few things, like keeping a bulletin-board enclosure for union announcements, agreeing to follow non-discrimination laws, and providing rest periods and leaves of absence for its employees. But dozens of major disputes remained.

History then repeated itself when Noah's Ark extended yet another "final offer." This one was no more successful than the others because it included numerous terms that the union had already rejected. Once the union refused, the company declared another impasse and made the changes unilaterally. *See Noah's Ark I*, 31 F.4th at 1107–08 (explaining that employers can make unilateral changes to the terms of employment only after the parties have reached a good-faith impasse).

The union reacted by filing another complaint. An administrative-law judge found that Noah's Ark had both bargained in bad faith and prematurely declared an impasse. *See* 29 U.S.C. § 158(a)(5). In addition to receiving another order to keep negotiating, Noah's Ark had to provide backpay to its employees, reimburse the union for its bargaining expenses, and have its CEO read a remedial notice at an all-employee meeting.

The Board thought those remedies did not go far enough, so it ordered Noah's Ark to mail a copy of the remedial notice to every employee, post the notice in its plant, and allow "the Board or . . . its duly[]authorized representatives" to inspect the facility for up to a year. The Board now seeks enforcement of its order. *See* 29 U.S.C. § 160(e).

## II.

We will enforce the Board's order if substantial evidence supports it, "even if we might have reached a different decision had the matter been before us de novo." *Dolgencorp, LLC v. NLRB*, 950 F.3d 540, 546 (8th Cir. 2020) (citation omitted). The same goes for the bad-faith-negotiation and no-impasse findings. *See Noah's Ark I*, 31 F.4th at 1107.

## A.

It is "an unfair labor practice for an employer . . . to refuse to bargain . . . in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). Employers do not have "to agree to a proposal or . . . mak[e] . . . concession[s]." *NLRB v. Hardesty Co.*, 308 F.3d 859, 865 (8th Cir. 2002) (citation omitted). But they cannot negotiate "as a kind of charade or sham, all the while intending to avoid reaching an agreement." *Id.* (citation omitted).

Noah's Ark, at least according to the Board, did not take the negotiations seriously. Consider its conduct. It opened with a "regressive" offer—one that backtracked on issues like working hours, arbitration, and subcontracting. *See Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1382 (8th Cir. 1993) (characterizing a proposal as made in bad faith because it "would have permitted [the employer] to unilaterally change working conditions whenever it pleased"). From that point on, Noah's Ark never budged on those topics, even as the parties made progress on other minor points, like allowing the union to keep its glassed-in bulletin board. *See Hardesty*, 308 F.3d at 866 (noting that hardline bargaining positions can be evidence that an employer "had no intention of reaching an agreement").

On other major issues, Noah's Ark refused to engage at all. One example was its refusal to sign a "pro forma pledge about workplace respect." It also rejected union proposals covering working hours and vacation time without offering alternatives of its own. *See Hosp. of Barstow, Inc. v. NLRB*, 897 F.3d 280, 290 (D.C. Cir. 2018) (explaining that "an outright refusal to submit proposals or counterproposals evidences bad-faith bargaining"); *Norris v. NLRB*, 417 F.3d 1161, 1170 (10th Cir. 2005) (holding that "merely repeat[ing] . . . prior demand[s]," rather than "submit[ting] any counterproposals," is evidence that an employer is not bargaining in good faith (citation omitted)). These tactics, combined with its "regressive" opening offer, are substantial evidence of the company's unwillingness to approach the renewed negotiations "with an open mind and sincere intention to reach an agreement." *NLRB v. Columbia Trib. Publ'g Co.*, 495 F.2d 1384, 1391 (8th Cir. 1974) (citation omitted).

## B.

We reach the same conclusion about the Board's no-impasse finding. Underlying the collective-bargaining process is an "obligation to confer in good faith," 29 U.S.C. § 158(d), which means that "unilateral change[s] in conditions of employment" are a last resort. *NLRB v. Katz*, 369 U.S. 736, 743 (1962). Only when "good[-]faith negotiations have exhausted the prospects of concluding an agreement" can an employer act on its own. *NLRB v. Whitesell Corp.*, 638 F.3d 883, 890 (8th Cir. 2011) (citation omitted). "Whether the parties have reached this point is a case-specific inquiry . . . ." *Id.* (citation omitted).

As a threshold matter, "[a]n impasse presupposes a reasonable effort at good[-]faith bargaining." *Noah's Ark I*, 31 F.4th at 1108 (citation omitted) (describing it as a "prerequisite" to "[a]n impasse"). And here, there is substantial evidence that Noah's Ark did not bargain in good faith, both in the previous rounds of negotiations and this one. *See id.*

-5-

But even if bad-faith negotiations could produce a good-faith impasse, they did not do so here.  Consider the fact that Noah's Ark ended the renewed talks quickly, after just two months.  *See Thrifty Payless, Inc. v. NLRB*, 86 F.4th 909, 919 (D.C. Cir. 2023) (holding that an impasse did not exist after seven months of negotiations and "a handful of sessions").  Or that the most recent round of negotiations did not cover major issues like wages, retirement benefits, and health insurance, which suggests that the discussions never got very far.  *See Whitesell*, 638 F.3d at 890 (identifying the "importance of the . . . issues as to which there is disagreement" as a factor in deciding whether there has been an impasse).  Add the fact that Noah's Ark had jumped the gun in declaring an impasse before, and it is not difficult to see why the Board sided with the union on this issue.

Noah's Ark has a different view of the evidence.  It points to a note from its attorney that "[n]ot having arbitration is a deal buster according to the [u]nion."  The union's negotiator then told the administrative-law judge that he had "no way to get" an agreement without arbitration.  From there, the company argues that the arbitration issue was so important to everyone that the Board had no choice but to conclude that continued negotiations would have been an exercise in futility.

The problem for Noah's Ark is the standard of review.  Although the Board certainly *could* have concluded that deadlocking on arbitration was fatal to the negotiations, there was another interpretation of the evidence: it gave Noah's Ark an excuse to end them.  *See Dolgencorp*, 950 F.3d at 546 (recognizing that the same record can support "different decision[s]" (citation omitted)).

An important clue is the lack of meaningful discussion on other major issues.  The narrow scope of the talks and their quick end eliminated the possibility of further compromise.  *See Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 21 (D.C. Cir. 2012).  Noah's Ark had, after all, been willing to relent on arbitration in a previous round of negotiations.  And the reason for its ongoing opposition was hardly insurmountable: the small pool of arbitrators nearby.  Nothing prevented the parties from broadening their search or exploring alternatives, particularly if they could

agree on other issues. The point is that substantial evidence supports the Board's conclusion that there was no "*complete* breakdown" in the negotiations. *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 350 (D.C. Cir. 2011) (emphasis added) (citation omitted).

III.

Beyond the findings, Noah's Ark also disagrees with how far the Board went in remedying the violations. The "extraordinary" remedies, which the company views as unconstitutional, unnecessary, and punitive, placed several demands on the company and its CEO, from reading and posting a notice of rights to giving a Board representative access to the facility for up to a year. Although we would ordinarily review the remedies to ensure that they fall within the Board's "broad discretionary power," *Noah's Ark I*, 31 F.4th at 1108, Noah's Ark has never raised these specific objections before.

We can only consider those "objections that were . . . urged before the Board." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982) (discussing jurisdiction); *see* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court."). The only exception is for "extraordinary circumstances." 29 U.S.C. § 160(e); *see Noah's Ark I*, 31 F.4th at 1109 n.7.

Here, there are no extraordinary circumstances. On the contrary, Noah's Ark initially challenged certain remedies in its exceptions to the administrative-law judge's order, but not on the same grounds it raises here. And once the Board added remedies of its own, Noah's Ark did not seek reconsideration. *See Noah's Ark I*, 31 F.4th at 1109. Nothing prevented it from raising its objections earlier, either before the administrative-law judge or the Board. Unfortunately, it is now too late. *See id.* (Stras, J., concurring) (explaining that "we have no business deciding" newly raised issues).

IV.

We accordingly grant enforcement of the Board's decision and order.

_____