# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued February 8, 2018        Decided August 3, 2018

No. 15-1231

CC1 LIMITED PARTNERSHIP, DOING BUSINESS AS COCA COLA
PUERTO RICO BOTTLERS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

---

Consolidated with 15-1467

---

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

---

*Néstor M. Méndez-Gómez* argued the cause for petitioner. With him on the briefs were *María D. Trelles Hernández* and *Jason R. Aguiló Suro*. *Carlos Concepción* entered an appearance.

*Jeffrey W. Burritt*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy

Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: ROGERS, GRIFFITH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The National Labor Relations Board ("Board") determined that CC1 Limited Partnership ("CC1") unlawfully fired several employees who had engaged in work stoppages. Although we agree with the Board that there was substantial evidence that one of the discharged employees played no part in a work stoppage, we remand to the Board for further explanation its conclusion that the later wildcat strike was protected activity. We also dismiss additional claims CC1 makes but failed to properly preserve for our review.

I

A

CC1 operates a bottling plant under the name of Coca Cola Puerto Rico Bottlers in Cayey, Puerto Rico. Its warehouse employees are represented by the Union De Tronquistas De Puerto Rico, Local 901, International Brotherhood of Teamsters (the "Union"). Until October 2008, José Adrián López was the Union's chief negotiator with CC1 and the principal representative of the employees. Employees Miguel Colón, Carlos Rivera, Francisco Marrero, Romián Serrano, and Félix Rivera were elected to participate in negotiations on the Union's behalf as shop stewards. The collective-bargaining agreement that had been in place between CC1 and the Union since 2003 expired on July 31, 2008.

During the afternoon of September 9, 2008, CC1 and López met to negotiate a new agreement. López planned to share the status of the negotiations at an 8:30 p.m. meeting in CC1's cafeteria with CC1 employees who worked the late shift. When López arrived at the plant that night, the security guard tried to block his entrance. Over the guard's protests, López entered the plant anyway and held the meeting. During the meeting, a CC1 supervisor interrupted López and told him to leave the plant. López refused, and the two argued. Eventually, the supervisor left the cafeteria to call security, and López led the group of employees to the plant's warehouse to continue the meeting. The shop stewards on site at the time encouraged other employees to abandon their workstations and follow López.

At 8:45 p.m., Colón arrived at the plant to attend the meeting in the cafeteria with López. By that time, the meeting had moved to the warehouse. By 9:00 p.m., Colón joined the meeting at the warehouse, where he found López and about ninety employees. Soon after, police called by CC1's security came, and López told the employees to return to work. All in all, the work stoppage caused by López's meeting cost the company two hours of work from the employees who attended.

On the next day, CC1 suspended Colón and the other shop stewards. According to the letter each received from the company, they were suspended for "invading private property, encouraging others to abandon their job, verbally abusing the supervisors and intentionally paralyzing the production line" the night before. App'x 369. In response, the Union called a meeting at which the CC1 employees unanimously agreed to strike unless management agreed to three demands: (1) reinstate the suspended shop stewards; (2) forgo filing any charges against the Union based on the work stoppage; and (3) return to the table to negotiate a new collective-bargaining

agreement. The next day, a Union officer requested strike assistance from national headquarters.

One month later, the Union had not yet met with CC1 negotiators or planned a strike. On October 9, Colón and the other shop stewards circulated a flyer announcing a meeting on October 12 to discuss a strike. But the meeting was not authorized by the Union. Upon seeing the flyer, one Union official asked Colón not to "divide the membership." Another Union representative suggested to him that only a strike would ensure reinstatement of the shop stewards. On October 10, CC1 discharged the suspended shop stewards. Two days later at the October 12 meeting called by Colón and the other shop stewards, employees signed a petition authorizing a strike unless CC1 agreed to the Union's demands. But the Union had no part in the meeting. No Union official attended, and the Union never responded to Colón's list of employees who had signed the strike petition.

On October 14, the national headquarters approved the Union's request to provide assistance in a strike. The next day, the Union wrote CC1 to demand that negotiations resume. CC1 agreed, but the Union never replied.

On October 19, the shop stewards met at Colón's home to prepare to strike. From October 20 until October 22, more than 100 CC1 employees went on strike. Many of them used picket signs and loudspeakers to protest the company's treatment of López and the firing of the shop stewards. They also demanded that CC1 reinstate the shop stewards and negotiate a new collective-bargaining agreement.

On the first day of the strike, CC1 warned the Union that the company planned to "resort to ulterior actions against the Union and its representatives" unless the strike stopped. App'x

399. Upon receiving CC1's message, the Union explained that the strike was an illegal "wildcat" strike because it was not backed by the Union: "We want to clarify that we have not sent or authorized the presence of Officers or Union members in said stoppage; therefore, the presence there of any Union member would have been of their own accord, not official, and in violation of the statutes of the Union." App'x 403. The Union added that it would take action against the "false leaders" who were "threatening . . . the welfare of the great majority of the [CC1] workers in order to promote their own ignoble interests." *Id.* CC1 distributed the Union's message to the striking employees, some of whom responded by abandoning the strike.

Once the strike ended, CC1 suspended or discharged eighty-six of the striking employees. At the Union's request, CC1 agreed to reinstate suspended employees who signed a so-called "last-chance agreement," which subjected them to immediate termination should they violate any of the agreement's terms.

B

CC1's response to the events surrounding the work stoppage and the strike drew multiple charges. In 2009, the Board's General Counsel issued a complaint alleging that CC1 unlawfully discharged its employees for participating in those actions. After an evidentiary hearing, an Administrative Law Judge (ALJ) determined that discharging Colón violated the NLRA because the evidence showed he had not encouraged the September 9 work stoppage as CC1 claimed. The ALJ determined that the wildcat strike was protected by the NLRA, making CC1's discharge of the striking employees unlawful. The ALJ also concluded that the last-chance agreements were unlawful.

CC1 challenged the ALJ's decision, which the Board affirmed with some exceptions. *CC1 Limited Partnership*, 358 N.L.R.B. 1233 (2012). As to the firing of Colón, the Board found that he had not encouraged the work stoppage and, even if he had, his actions would have been protected by the NLRA. *Id.* at 1234 & n.5. As to the wildcat strike, the Board agreed that it was protected activity because it supported the Union's strategy. *Id.* at 1235-36. To this latter point, the Board looked at the two factors set forth in *Silver State Disposal Service, Inc.*, 326 N.L.R.B. 84, 103 (1998): "(1) whether the employees [attempted] to [bypass their union and] bargain directly with the employer and (2) whether the employees' position [was] inconsistent with the union's position." *CC1*, 358 N.L.R.B. at 1235. The Board determined that the employees were striking as individuals on behalf of the Union, reasoning the Union never told the employees not to strike and that they did not know the Union was pursuing separate negotiations with management. *Id.* at 1235-36. The Board also concluded that the employees' three demands of CC1 were consistent with the Union's position. *Id.* In its order, the Board required CC1 to provide backpay to the discharged employees. *Id.* at 1238.

The Board denied CC1's motion for reconsideration. Order Denying Motion for Reconsideration, 2013 WL 298118 (N.L.R.B. Jan. 24, 2013). CC1 sought review in our court, but we held its petition in abeyance until the Supreme Court decided *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). In *Noel Canning*, the Court held that the recess appointments of three members of the Board, two of whom were on the 2012 panel, were unlawful. *Id.* at 2557, 2578. As a result, the Board set aside the 2012 decision. Order, 2014 WL 2929759 (N.L.R.B. June 27, 2014). Meanwhile, CC1 reached settlement agreements with all of the employees involved except for four

who had been discharged for striking and Colón. *CC1 Limited Partnership*, 362 N.L.R.B. No. 125, at 1 n.1 (June 18, 2015).

In 2015, a lawfully appointed panel of the Board reviewed de novo the ALJ's decision and "affirm[ed] the [ALJ's] rulings, findings, and conclusions . . . to the extent and for the reasons stated" in the 2012 decision and order. *Id.* at 1. The new panel unanimously found that CC1 had unlawfully discharged Colón "by terminating [him] for his participation in the [September] walkout." *Id.* at 3 n.7. But the panel divided over whether the October wildcat strike was protected activity. The dissent argued that the strike was not because it "undermined the Union's position as . . . exclusive collective bargaining representative," *id.* at 5, and diluted the "united front" that gives unions the bargaining power to make their negotiations effective, *id.* (quoting *Emporium Capwell Co. v. W. Addition Cmty. Org.*, 420 U.S. 50, 70 (1975)). In the dissent's view, the striking employees were a "dissident" faction that intended to "usurp" the Union's exclusive negotiation authority. *Id.* In the view of the majority, the striking employees were simply "ma[king] good on the [Union's previous] strike threat." *Id.* at 3. As with the 2012 order, the Board ordered CC1 to provide backpay in a lump sum to the unlawfully discharged employees, *id.* at 4, but newly required CC1 to reimburse employees for any tax penalties triggered by the award, *id.* The Board also ordered CC1 to "[c]ease and desist from . . . [c]oercing employees into signing overbroad 'last chance' agreements as a condition of their reinstatement" and to remove any references to those agreements from the files of the employees who signed one. *Id.*

In July 2015 CC1 petitioned our court for review, and in December 2015 the Board cross-applied to enforce its decision. We consolidated the cases and consider now whether the Board

properly determined that CC1 violated the NLRA by firing Colón and the striking employees.

## II

The Board had jurisdiction over this matter pursuant to 29 U.S.C. §§ 151, 160(a), and we have jurisdiction under § 160(f).

Even though "[w]e review the [Board's] orders under a deferential standard," we cannot affirm a decision made without a "reasoned explanation." *Int'l Transp. Serv., Inc. v. NLRB*, 449 F.3d 160, 163 (D.C. Cir. 2006) (internal quotation marks omitted). We will affirm a decision that applies a "reasonably defensible" interpretation of the NLRA, even if we "might prefer another view of the statute." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496-97 (1979). And we uphold the Board's policy judgments that are not arbitrary or capricious. *Int'l Transp.*, 449 F.3d at 163.

The Board's factual findings are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). "Indeed, the Board is to be reversed only when the record is so compelling that no reasonable fact finder could fail to find to the contrary." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (citations and internal quotation marks omitted). We will accept the credibility determinations made by an ALJ and adopted by the Board unless those determinations are "hopelessly incredible, self-contradictory, or patently unsupportable." *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012) (internal quotation marks omitted).

9

III

A

CC1 asserts that it fired Colón because he encouraged the September 9 work stoppage, which was unlawful.* The Board responds that CC1 was motivated instead by Colón's support for the Union. "It is well settled that an employer violates the NLRA by taking an adverse employment action . . . in order to discourage union activity." *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125 (D.C. Cir. 2001) (citing *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980)). To demonstrate that the employer's motivation was unlawful, the General Counsel must present to the Board "a prima facie showing sufficient to support the inference that protected [i.e., union-related] conduct was a motivating factor in the . . . adverse action." *Id.* (alterations in original) (quoting *TIC-The Indus. Co. Se., Inc. v. NLRB*, 126 F.3d 334, 337 (D.C. Cir. 1997)). "Once a prima facie case has been established, the burden shifts to the company to show that it would have taken the same action in the absence of the unlawful motive." *Id.* at 126. "[O]ur review of the Board's conclusions as to discriminatory motive is [especially] deferential, because most evidence of motive is circumstantial." *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1075-76 (D.C. Cir. 2016) (internal quotation marks omitted).

Before the ALJ, the General Counsel argued that CC1's reason for discharging Colón must have been unlawful because the company's professed explanation, his encouragement of the work stoppage, never happened. The ALJ found that Colón arrived at the plant *after* the employees had already left their

---

* We do not reach the issue of whether the conduct CC1 alleges was protected activity because, as we determine below, this conduct was a pretext to discharge Colón and not CC1's true motivation.

work stations to gather at the warehouse, leaving no opportunity for Colón to encourage the work stoppage. Only Armando Troche, a CC1 supervisor, testified that he saw Colón telling employees to stop working. The ALJ did not credit this testimony because he believed, mistakenly as it turned out, that Troche hadn't mentioned Colón's conduct in his pretrial affidavit. Despite the ALJ's mistake, he found other reasonable grounds to discount what Troche claimed. Colón and two corroborating witnesses testified that he had not encouraged the work stoppage. Moreover, Troche's testimony focused on the shop stewards as a group, mentioning Colón only to say that when he arrived he joined in the other shop stewards' conduct. App'x 307.

We cannot second-guess "the ALJ's credibility determinations, as adopted by the Board, unless they are patently insupportable." *Gold Coast Rest. Corp. v. NLRB*, 995 F.2d 257, 265 (D.C. Cir. 1993) (quoting *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C. Cir. 1988)). Because there is scant evidence that Colón encouraged the work stoppage and plenty of evidence that he did not, we defer to the Board.

If Colón did not encourage the work stoppage, as we conclude, the Board was justified to infer that some other conduct must have motivated CC1, and the General Counsel successfully made a prima facie case that such conduct was protected activity. *See Prop. Res. Corp. v. NLRB*, 863 F.2d 964, 967 (D.C. Cir. 1988) (stating that the Board "can infer from falsity of employer's stated reason for discharge that motive is unlawful" (citing *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966))). The burden shifted to CC1 to present an alternative, lawful motivation, but the company still offers none, instead standing behind its argument that "Colón

did indeed encourage employees to engage in a work stoppage." CC1 Br. 44.

It is possible of course that CC1 fired Colón based on a mistaken but good-faith belief that he had encouraged the work stoppage. *See Sutter E. Bay Hosps. v. NLRB*, 687 F.3d 424, 435-36 (D.C. Cir. 2012). But CC1 does not make this argument. *See N.Y. Rehab. Care Mgmt. v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007). Regardless, the Board concluded from the ALJ's findings that CC1 did not believe in good faith that Colón had encouraged the work stoppage. For example, the ALJ determined that CC1 "conducted a superficial investigation as it concerned Shop Steward Col[ó]n, and manufactured evidence in its desire to lump together the actions of the four other Shop Stewards with those of Col[ó]n." App'x 21. The ALJ also found that "none of the Shop Stewards including Col[ó]n were ever provided the opportunity to state their position concerning the events of September 9, but rather were summarily suspended on September 10." *Id.* These findings certainly cast suspicion on the possibility that CC1 fired Colón because it made a good-faith mistake. *See Inova Health Sys. v. NLRB*, 795 F.3d 68, 84 (D.C. Cir. 2015) (doubting that a company fired its employee for her unprofessional conduct, as it claimed, when that company's investigation into her behavior was "one-sided" and incomplete).

In these circumstances and given our deferential standard of review, we affirm the Board's conclusion that CC1 did not fire Colón because it believed that he had encouraged the September 9 work stoppage. *See Fort Dearborn Co.*, 827 F.3d at 1072. And because CC1 didn't satisfy its burden to demonstrate an alternative, lawful reason for firing him, we affirm the Board's conclusion that CC1 fired Colón for unlawful reasons. *See Shamrock Foods Co. v. NLRB*, 346 F.3d

1130, 1135 (D.C. Cir. 2003) (explaining that once the General Counsel shows that a company had unlawful motivations, the burden to demonstrate a lawful motivation shifts to the company) (citing *Wright Line*, 251 N.L.R.B. at 1089).

B

CC1 argues that it was lawful to fire the employees who participated in the October strike because it was a wildcat strike, which is not protected by the NLRA. The Board agrees that the October strike was a wildcat strike, but believes that it was protected by the NLRA.

Wildcat strikes are governed by sections 7 and 9 of the NLRA. In most circumstances, section 7 protects an employee who claims his labor rights through "concerted activities," such as strikes. 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."); *see also NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 233 (1963). An employer who disciplines an employee for exercising a protected right to strike violates the NLRA. 29 U.S.C. § 158(a)(1); *Consolidated Commc'ns, Inc. v. NLRB*, 837 F.3d 1, 7 (D.C. Cir. 2016). Section 9 provides that a lawfully elected union is the *exclusive* bargaining representative of the employees. 29 U.S.C. § 159(a) ("Representatives . . . selected for the purposes of collective bargaining . . . shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . .").

The exclusive bargaining authority granted unions by section 9 sometimes creates a tension, which the NLRA does not clearly resolve, with labor rights granted employees by section 7. The Supreme Court addressed this tension in *Emporium Capwell Co. v. Western Addition Community Organization*, holding that a strike is not protected activity when it interferes with an elected union's exclusive representation. 420 U.S. at 62. Even so, the Court did not strip the NLRA's protection from all wildcat strikes. By electing a union, employees do not "waive[] all rights to protect themselves against an employer's unlawful actions." *Jones & McKnight, Inc. v. NLRB*, 445 F.2d 97, 105 (7th Cir. 1971); *see also Bridgeport Ambulance Serv., Inc.*, 302 NLRB 358, 363-64 (1991) (explaining that a wildcat strike was still protected activity because "the employees' demands and statements during this period w[ere] not in derogation of the Union or contrary to, or inconsistent with, the Union's bargaining position"), *enf'd*, 966 F.2d 725, 729 (2d Cir. 1992) (agreeing that *Emporium Capwell* does not transform all un*authorized* concerted activity into un*protected* activity). It is only when employees' activity undermines the Union's objectives or position as bargaining authority that it loses NLRA protection.

In light of *Emporium Capwell* and *Silver State*, the Board looked at whether the negotiation efforts of the CC1 employees were independent of the Union or inconsistent with its strategy. *CC1*, 362 N.L.R.B. No. 125 at 1. "The resolution of any statutory ambiguity latent in the NLRA is a task that the Congress, in the first instance, has entrusted to the Board, not this Court," *Children's Hosp. & Research Ctr. of Oakland, Inc. v. NLRB*, 793 F.3d 56, 59 (D.C. Cir. 2015), and we think the Board's interpretation is "reasonably defensible," *Ford Motor Co.*, 441 U.S. at 497. *See Children's Hosp.*, 793 F.3d at 59 (deferring to the Board's understanding of the "interplay" between NLRA provisions that, on their faces, seemed to

conflict); *E. Chi. Rehab. Ctr., Inc. v. NLRB*, 710 F.2d 397, 402-03 (7th Cir. 1983) ("[I]f the Board chooses to distinguish between wildcat strikes that undermine the union's position as exclusive collective bargaining representative and ones that do not . . . we must let it." (citations omitted)). However, the Board failed to explain how it applied *Silver State* to the employees who continued to strike after learning the Union disavowed it as a move by "false leaders." Because the employees knew the Union disapproved of the strike, it seems that the employees who continued to strike might have been doing so on their own behalf for their own reasons. The Board dismissed this suggestion because "[t]he Union sent a letter to [CC1] stating that the strike was not authorized, but it was [CC1]—not the Union—that photocopied the letter and asked security guards to give it to the strikers." *CC1*, 362 N.L.R.B. at 2 n.6.

It is unclear to us how CC1's distribution of the letter affected the Board's decision. Perhaps the Board thought the striking employees' *knowledge* of the Union's position wasn't important unless that knowledge came from the Union itself. But that's just a guess, and we can't rely on guesses. We cannot determine if the Board based its decision on a reasonably defensible interpretation of the NLRA if we do not know how the Board reached its conclusions. *See Int'l Transp.*, 449 F.3d at 163. In short, we cannot determine if there was substantial evidence for the Board to find that the wildcat strike was protected activity. We remand this issue so that the Board can explain the importance of the provenance of the letter and also whether the Union's message to CC1 accurately represented its position.

C

CC1 makes two additional arguments, one about the remedy granted by the Board and another about the Board's

decision that the last-chance agreements were unlawful. But we dismiss them both without considering their merits because CC1 fails to properly raise them on appeal.

First, CC1 argues that we should reverse the Board's order to compensate Colón and the striking employees for the tax consequences of the backpay award. CC1 failed to raise this argument before the Board, and section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see also Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982) ("[T]he Court of Appeals lacks jurisdiction to review objections that were not urged before the Board.").

CC1 argues that the exception for "extraordinary circumstances" applies here because the Board did not impose the tax remedy until its 2015 decision. But the unusual procedural history in this case that led to a second Board decision did not deprive CC1 of an opportunity to timely challenge the ordered remedy. And CC1 does not offer an excuse for failing to move for reconsideration of the Board's 2015 order on this ground. *See Woelke*, 456 U.S. at 665-66 (noting that the section 10(e) bar applies to issues that the parties did not raise before the Board but were nonetheless decided by the Board if the parties failed to object to the findings in a petition for reconsideration or rehearing); *see also Enter. Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 551 (D.C. Cir. 2016). We are therefore "powerless" to review it. *Enter. Leasing*, 831 F.3d at 550 (internal quotation marks omitted).

Second, CC1 argues that because it hadn't realized the last-chance agreements were at issue in this case, we should not enforce the Board's finding that they were unlawful. But CC1

raised this for the first time in its reply, not opening, brief and thus forfeited this claim. *See N.Y. Rehab. Care Mgmt.*, 506 F.3d at 1076; *New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (stating that petitioners waive arguments that they fail to raise in their opening briefs) (citing *Verizon Tel. Cos. v. FCC*, 292 F.3d 903, 911-12 (D.C. Cir. 2002)). As a result, summary enforcement is appropriate. *See Carpenters & Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 808 (D.C. Cir. 2007) ("[I]t is our longstanding rule that '[t]he Board is entitled to summary enforcement of the uncontested portions of its order[s].'" (second and third alterations in original) (quoting *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006))).

## IV

We vacate and remand for further explanation the Board's conclusion that the striking employees were unlawfully terminated for engaging in protected activity. In all other respects, we deny CC1's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*