[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-11339

————————————————

SECURITY WALLS, LLC,

                                                                Petitioner,

*versus*

NATIONAL LABOR RELATIONS BOARD,

                                                                Respondent.

————————————————

Petitions for Review of a Decision of the
National Labor Relations Board
Agency No. 15-CA-255865

————————————————

Before BRANCH and LUCK, Circuit Judges, and SMITH,* District Judge.

BRANCH, Circuit Judge:

The National Labor Relations Board (the "NLRB" or "the Board") determined that Security Walls, LLC ("Security Walls"), unlawfully fired an employee for activity protected under the National Labor Relations Act ("NLRA"). Security Walls now petitions this Court for review of the Board's decision, arguing that the employee's activity was not protected because he did not utilize the union's grievance process first and because his activity was inconsistent with the collective bargaining agreement then in place. The Board filed a cross-petition for enforcement of its order. After careful review and with the benefit of oral argument, we conclude that the employee's activity was protected. Accordingly, we grant the Board's application for enforcement and deny Security Walls's petition for review.

## I.        Factual Background

Since 2017, Security Walls has provided security services for the National Aeronautics and Space Administration ("NASA") at the Michoud Assembly Facility ("Michoud") in New Orleans, Louisiana. The company employs approximately 40 security officers, whose responsibilities include controlling entry and access to Michoud and other on-site buildings and responding to calls for

---

* The Honorable Rodney Smith, United States District Judge for the Southern District of Florida, sitting by designation.

service and emergencies. The International Union, Security, Police and Fire Professionals of America ("the union") represents the officers at Michoud, and a collective bargaining agreement covered the employees from October 1, 2017, to September 30, 2020.

In January 2018, Security Walls hired Randall Kelley to work as a security officer. Before Kelley started work at Michoud, he attended a mandatory training. During his training, Security Walls paid Kelley the hourly rate for trainees, which was lower than the rate for on-duty officers. After the training ended, Kelley noticed that Security Walls continued to pay him at the trainee rate in his first paycheck as an on-duty officer—which resulted in underpayment of almost $700—and failed to reimburse him for mileage and other out-of-pocket expenses incurred during the training. After discussing these issues with other coworkers, he discovered that another newly hired officer, Mandie Lockwood, had been similarly underpaid and unreimbursed.

With Lockwood's support, Kelley reported the underpayment and reimbursement issues to Captain Henry Conravey and Chief Jules Perrie, Security Walls's on-site managers. After several weeks passed without a resolution, Kelley, with Lockwood's encouragement, contacted Security Walls's corporate human resources department directly. Within hours, Kelley and Lockwood each received a wire transfer for their missing wages. But despite continuing to ask for Conravey's assistance, Kelley did not receive his missing training reimbursements. Eventually, Kelley asked Conravey if he should contact human resources

directly about the issue.  Conravey replied that Kelley would be "suspended on the spot" if he called "corporate" again without Conravey's permission.

The bungled payments were just the beginning of the issues that Kelley encountered during his employment.  Consistent with the collective bargaining agreement between Security Walls and the union, Security Walls selected officers for mandatory overtime in reverse order of seniority, proceeding systematically through the entire seniority list and only returning to the bottom after every officer worked an overtime assignment.  In April 2018, Lieutenant Jordan Robinson began supervising the second shift—which is the shift Kelley worked.  Instead of assigning overtime from the spot on the seniority list where the prior supervisor had left off, Robinson started at the bottom of the list so that officers with the lowest seniority had to work overtime twice.

Kelley and other adversely affected officers discussed the situation, and, with the officers' support, Kelley spoke to Robinson about the inequitable assignment of overtime.  In response, Robinson chastised Kelley for talking to others "behind his back."

The following month, officer Emanual Rahman stopped a vehicle from entering Michoud because the adult occupants appeared to be intoxicated and two unrestrained children were in the backseat.  Rahman reported the incident over the radio, and Robinson, Kelley, and another officer, Thomas Benasco, reported to the scene.  Robinson directed Rahman to escort the vehicle off the property and not to detain it or contact the occupants.  Kelley

and Benasco questioned Robinson's directive.  They attempted to persuade Robinson that they had a duty to prevent the vehicle from returning to the road.  Kelley expressed concern about the adults' impaired condition and the presence of the unrestrained children. When Robinson asked, Benasco said that he agreed with Kelley.

Becoming agitated, Robinson punched his fist into his hand and yelled and cursed at Rahman, Kelley, and Benasco.  Then, before leaving, Robinson said that "nobody better talk shit about me when I leave here" and "[don't] let me find out that anyone's talking behind my back."  Despite Robinson's instructions, the three officers discussed his behavior and agreed that it should be brought to management's attention.  The next morning, Kelley reported the incident to Conravey, Robinson's superior, and Conravey said that he would take care of it.

The next issue Kelley encountered involved his post. Officers at Michoud hold either stationary or mobile posts.  When assigned to a stationary post, officers are required to stay within a designated building or area.  When assigned to a mobile post, officers use company-owned vehicles to patrol larger areas. Although supervisors create post assignments for each officer daily, it is common for officers to trade assignments.

It was well known that Kelley disliked stationary posts and preferred a mobile post. On June 6, 2018, while Kelley was assigned to a mobile post, he initiated a traffic stop and arrested a FedEx driver.  Shortly afterward, Robinson informed Kelley that NASA was investigating the incident and that Kelley was restricted to a

stationary post until the investigation was complete. After about a week had passed without NASA reaching out about the incident, Kelley asked Robinson for more information. Robinson replied that FedEx, not NASA, was conducting the investigation and that Kelley could return to mobile patrol on July 1.

Later that day, when Kelley was discussing his post restriction with a union representative, Robinson approached Kelley. He accused Kelley of "talk[ing] shit behind his back" and suggested that they go to a back office and have a conversation. The men squared off and exchanged words until another officer intervened and separated them.[1]

Kelley immediately reported the incident to Chief Perrie. During their conversation, Chief Perrie explained that Kelley had never been under investigation and that Robinson simply wanted to "ground" Kelley for 30 days because Robinson "got tired of hearing [Kelley's] name come up."

The following day, Security Walls suspended Kelley for two days without pay for purportedly violating the collective bargaining agreement by initiating a verbal altercation with Robinson. Security Walls had never previously disciplined any

---

[1] Robinson's and Kelley's accounts of this incident differ. According to Robinson, Kelley performed a "leg sweep" on him, causing him to fall against the wall. For his part, Kelley denies that any violence or physical altercation occurred during their confrontation but maintains that Robinson threatened him with violence.

employee for initiating a verbal altercation, fighting, or any other disruptive behavior, despite instances of such conduct occurring.

Additionally, during the summer of 2018, officers heard rumors that Security Walls was considering a schedule change in which officers would move from five-day workweeks with eight-hour shifts to three-day workweeks with twelve-hour shifts. Concerned, Kelley created a written analysis that showed how the potential change would dramatically reduce the income of dayshift officers compared to nightshift officers. Kelley shared his analysis with other officers, who also expressed concern over the disparate impact of the schedule change.

Then on July 9, 2018, Kelley emailed Security Walls's owner Juanita Walls and expressed concerns over a workplace atmosphere of threats, intimidation, and retaliation. He also complained about the potential shift to twelve-hour workdays. Walls responded that she would have her newly hired program manager, Brenda Hunter, look into the issue.

Kelley and Benasco met with Hunter a few weeks later, and Kelley shared his analysis about the potential schedule change. Kelley also complained about Chief Perrie and purported supervisory incompetence at Michoud. Shortly after the meeting, Robinson issued Kelley a verbal warning for calling off work without proper documentation.[2]

---

[2] The collective bargaining agreement requires an employee to provide a medical certificate if the employee is absent for more than three consecutive

On July 20, 2018, Kelley was assigned to "Post 3," which was a mobile patrol. At the time, based on the officers' on-the-job training, it was typical for officers to perform building checks inside Building 101. When officers working Post 3 checked Building 101, they would note that they did so on their daily patrol activity reports, which they provided to their supervisors.

Around 3:15 p.m., Kelley picked up Benasco and drove to Building 101. Once there, Kelley and Benasco joined three other on-duty officers in the building's lobby, and all of the officers used their personal cell phones in the lobby. Around 4:00 p.m., Robinson approached the officers and directed them to return to their respective posts.

On July 23, 2018, Security Walls suspended Kelley pending an investigation into his conduct on July 20. Robinson prepared the suspension paperwork, which said that Kelley committed "gross misconduct" in violation of the collective bargaining agreement when he was observed on closed circuit television lounging and using his cell phone for approximately 41 minutes in the lobby of Building 101. On July 30, 2018, Security Walls discharged Kelley for post abandonment.

The other officers who had lounged in the lobby with Kelley received lesser discipline. Benasco, who had abandoned his post,

workdays for medical reasons. In the two months before his verbal warning, Kelley had called off work four non-consecutive days either because he was sick or had to stay home with a sick child.

received only a verbal warning for using his personal cell phone. Another officer received a verbal warning for eating and not performing his assigned duties. And the two remaining officers, who were assigned to Building 101 that day, received no discipline.

After filing unfair labor practice charges with the Board, Kelley asked another officer to obtain copies of Security Walls's post orders—*i.e.*, documents that specify an officer's duties when assigned to a specific post. The officer photographed the post orders and gave them to Kelley, who provided them to the Board agent investigating the charges.

On February 5, 2020, Security Walls, through counsel, filed a motion seeking to postpone the then-scheduled hearing, asserting that Kelley had violated an unspecified federal law by photographing post orders and that Security Walls had referred Kelley's "criminal activity" to the Federal Bureau of Investigation ("FBI") and NASA for investigation. But Security Walls eventually retracted its threat, saying that it had retrained its officers regarding NASA's strict photography policy, and it had "no plans to do more." Security Walls never initiated a criminal investigation or referred the matter to NASA or the FBI.

## II.        Procedural History

After review,[3] the Board found that Kelley engaged in protected concerted activity on several occasions[4] and that Security Walls violated § 8(a)(1)[5] of the NLRA by (1) threatening Kelley with suspension if he engaged in protected concerted activity; (2) restricting Kelley to a stationary post because he engaged in protected concerted activity; (3) suspending Kelley in June 2018 because he engaged in protected concerted activity; (4) issuing a verbal warning in July 2018 because he engaged in protected concerted activity; (5) discharging Kelley because he engaged in protected concerted activity; and (6) threatening to initiate a

---

[3] On July 7, 2021, an administrative law judge issued a decision in Kelley's case. After Kelley and Security Walls filed objections to the decision, a three-member panel of the Board reviewed Kelley's case and issued the decision that we now review.

[4] Section 7 of the NLRA gives employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Here, for example, the Board found that Kelley engaged in protected concerted activity when he discussed "working conditions"—including "the underpayment of wages and the inequitable assignment of overtime"—with other employees and then relayed those complaints to Security Walls.

[5] Section 8(a)(1) provides that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7] of this title." 29 U.S.C. § 158(a)(1).

criminal investigation because Kelley provided evidence to the Board.

As to the remedy, the Board ordered Security Walls to cease and desist from engaging in its unfair labor practices. Affirmatively, the Board required Security Walls to offer Kelley reinstatement to his former job or a substantially equivalent position; make him whole for any loss of earnings or other benefits suffered as a result of the discrimination against him; compensate him for any adverse tax consequences with a lump-sum backpay award; compensate him for his search-for-work and interim employment expenses; remove from its files any reference to the discriminatory actions against Kelley; notify Kelley that Security Walls had undertaken these actions and that the discriminatory actions will not be used against him in any way; and post a remedial notice.

Unhappy with the Board's order, Security Walls petitions this Court for review, and the Board cross-petitions for enforcement of its order.

### III.        Standard of Review

"We review the Board's legal conclusions *de novo,*" keeping in mind that agencies, like the NLRB, often receive deference in construing the statutes that they are charged with administering. *Ridgewood Health Care Ctr., Inc. v. NLRB*, 8 F.4th 1263, 1275 (11th Cir. 2021); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *Visiting Nurse Health Sys., Inc. v. NLRB*, 108 F.3d 1358, 1360 (11th Cir. 1997) ("Traditionally, we accord considerable

deference to the Board's expertise in applying the [NLRA] to the labor controversies that come before it."); *see NLRB v. Dynatron/Bondo Corp.*, 176 F.3d 1310, 1313 (11th Cir. 1999) ("As in the case of construction of the [NLRA], we defer to the Board's application of its rules if the application is reasonable."). The Board's reasonable inferences in applying the law to the facts may not be displaced even though we might have reached a different conclusion in the first instance. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Likewise, the Board's findings of fact are "conclusive 'if supported by substantial evidence on the record considered as a whole.'" *Dynatron*, 176 F.3d at 1313 (quoting 29 U.S.C. § 160(e), (f)). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Contemp. Cars, Inc.*, 667 F.3d 1364, 1370 (11th Cir. 2012) (quotation omitted). "But this deferential standard is not merely a rubber[]stamp on agency decisionmaking." *Ridgewood Health Care Ctr.*, 8 F.4th at 1275 (quotation omitted). The Board's decision must be logical, rational, and based on facts that are supported by the record. *Id.* "[W]e will not enforce a Board decision that fails to engage in reasoned decisionmaking." *Id.*

"Our standard of review does not change when the Board reaches a conclusion different from that of the administrative law judge, . . . but the administrative law judge's conclusions are one factor to be considered in determining whether [the substantial evidence] standard has been satisfied." *Id.* at 1274. (quoting *Allied Med. Transp., Inc.*, 805 F.3d 1000, 1005 (11th Cir. 2015)).

### IV.        Discussion

Security Walls raises a single argument on appeal: that Kelley's conduct was unprotected because his demands were inconsistent with the collective bargaining agreement and because he did not channel his grievances through the union processes. For support, Kelley relies almost exclusively on *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50 (1975). But because Kelley's activity was not inconsistent with the collective bargaining agreement and because Kelley did not have to go through the union in the first place, *Emporium Capwell* does not save Security Walls. Thus, we conclude that Kelley's activities were protected. And, because substantial evidence supports Kelley's activity, we enforce the Board's order.[6]

We begin, as we must, with the statute. Section 7 of the NLRA "affirmatively guarantees employees the most basic rights of industrial self-determination": "'the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,' as well as the right to refrain from these activities." *Id.* at 61–62 (quoting 29 U.S.C. § 157).[7]

---

[6] Notably, Security Walls does not challenge whether substantial evidence supports the Board's findings. Accordingly, without argument to the contrary and because substantial evidence otherwise supports the Board's findings, we enforce the Board's order.

[7] In full, section 7 provides that

14                Opinion of the Court                22-11339

"These are, for the most part, collective rights, rights to act in concert with one's fellow employees; they are protected not for their own sake but as an instrument of the national labor policy of minimizing industrial strife 'by encouraging the practice and procedure of collective bargaining.'" *Id.* at 62 (quoting 29 U.S.C. § 151).

The next section of the NLRA, section 8, gives the former teeth by declaring that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." 29 U.S.C. § 158(a)(1).

Turning to the next statutory section, section 9(a) addresses the role that lawfully selected union representatives play, explaining that they are the exclusive representatives for the purpose of collective bargaining:

Representatives designated or selected for the purposes of collective bargaining by the majority of

---

[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

> the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.

29 U.S.C. § 159(a).  Then, section 9(a) qualifies the rule that union representatives "shall be the exclusive representatives of all the employees" with two provisos that focus on the employee's rights:

> *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

*Id.*[8]  With these statutory provisions in mind, we turn to how they work together.

---

[8] The purpose of these provisos "is to permit employees to present grievances and to authorize the employer to entertain them without opening itself to liability for dealing directly with employees in derogation of the duty to bargain only with the exclusive bargaining representative, a violation of [section 8]." *Emporium Capwell*, 420 U.S. at 61 n.12; *see also Black-Clawson Co., Paper Mach. Div. v. Int'l Ass'n of Machinists Lodge 355, Dist. 137*, 313 F.2d 179, 185 (2d Cir. 1962) (explaining that "the proviso was designed merely to confer

"Section 7 is broadly worded—deliberately so." *E. Chi. Rehab. Ctr., Inc. v. NLRB*, 710 F.2d 397, 402 (7th Cir. 1983); *see Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–68 (1978) (discussing the broad scope of section 7). And "[a]lthough section 9(a) qualifies section 7, it qualifies the part of section 7 that gives workers the right to bargain collectively." *E. Chi. Rehab.*, 710 F.2d at 402. Indeed, section 9(a) makes the union representatives—which are "designated or selected *for the purposes of collective bargaining*"—the "exclusive representatives of all the employees" *only* "*for the purposes of collective bargaining* in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a) (emphases added). Thus, the text of section 9(a) "does not—not explicitly anyway—qualify" or otherwise limit employees' "section 7 right to engage in other concerted activities

---

upon the employee the privilege to approach his employer on personal grievances when his union reacts with hostility or apathy" because "[p]rior to the adoption of this proviso in section 9(a), the employer had cause to fear that his processing of an individual's grievance without consulting the bargaining representative would be an unfair labor practice"). Thus, "rather than conferring an indefeasible right upon the individual employee to compel compliance with the grievance procedure," "section 9(a) merely set up a buffer between the employee and his union, 'permitting' the employee to take his grievances to the employer, and 'authorizing' the employer to hear and adjust them without running afoul of the 'exclusive bargaining representative' language of the operative portion of section 9(a)." *Black-Clawson Co.*, 313 F.2d at 185 (explaining that this interpretation "also best comports with the structure of the" statute because a proviso rarely creates substantive rights and obligations and more often "carves exceptions out of what goes before" (quotation omitted)).

for mutual aid or protection." *E. Chi. Rehab.*, 710 F.2d at 402; *see also id.* (explaining that this "natural" reading of sections 7 and 9(a) also comports with other sections of the statute—like "section 13, 29 U.S.C. § 163, which provides that '[n]othing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike . . .'").

We acknowledge, however, that "[t]he exclusive bargaining authority granted unions by section 9 sometimes creates a tension, which the NLRA does not clearly resolve, with labor rights granted employees by section 7." *CC1 Ltd. P'ship v. NLRB*, 898 F.3d 26, 34 (D.C. Cir. 2018). The Supreme Court confronted this tension in *Emporium Capwell*. In *Emporium Capwell*, the Supreme Court addressed whether the NLRA protects concerted activity by a group of minority employees to bargain with their employer over issues of employment discrimination. 420 U.S. at 52. There, a group of company employees presented a list of grievances— including a claim that the company was discriminating based on race—to a union representative. *Id.* at 53. After meeting with the company and looking into the matter, the union concluded that the company was discriminating and that the union would process every grievance through arbitration if necessary. *Id.* at 54. Some company employees pushed back, suggesting that the union's proposed procedures were inadequate to handle such a systemic grievance and that the union should begin picketing the store instead. *Id.* The union explained that the collective bargaining agreement bound the union to its processes. *Id.*

When the union met to begin its hearing on the issue, a group of employees refused to participate in the grievance procedure and walked out of the hearing. *Id.* at 54–55. Then, the dissident employees held a press conference at which they denounced the company's employment policy as racist, expressed their desire to deal directly with the company's "top management," and announced their intention to picket and boycott the store. *Id.* Shortly afterwards, at least four employees picketed the store throughout the day and distributed handbills at the entrance that urged consumers not to patronize the store. *Id.* The union representative advised the picketing employees to rely on the union's grievance process and warned that they might be fired for their activities. *Id.* at 56. Two of the picketing employees received written warnings that additional picketing or public statements about the company could lead to their discharge. *Id.* When they repeated their picketing and public statements the following week, they were discharged. *Id.*

After reviewing the employees' conduct, "the Board found that the employees were discharged for attempting to bargain with the [c]ompany over the terms and conditions of employment as they affected racial minorities" and that their activity was not protected under the NLRA. *Id.* at 57, 60. The Board concluded that

> such an attempt to bargain would undermine the statutory system of bargaining through an exclusive, elected representative, impede elected unions' efforts at bettering the working conditions of minority

> employees, and place on the [company] an unreasonable burden of attempting to placate self-designated representatives of minority groups while abiding by the terms of a valid bargaining agreement and attempting in good faith to meet whatever demands the bargaining representative put forth under that agreement.

*Id.* at 58 (quotation omitted).

The Supreme Court ultimately agreed with the Board and held that the employees' attempts to engage in separate bargaining were not protected by the NLRA. *Id.* at 52, 61. The Court explained that while "only the union may contract the employee's terms and conditions of employment, and provisions for processing his grievances," Congress also did not "authorize a tyranny of the majority over minority interests." *Id.* at 63–64 (quotation omitted). The "employees' substantive right to be free of racial discrimination," the Court reasoned, "[*could not*] *be pursued at the expense of the orderly collective-bargaining process contemplated by the NLRA.*" *Id.* at 69; *see also id.* at 67–69 (noting the potential conflict between employee groups if a handful of employees bypass the grievance procedure and an employer is confronted with bargaining demands from several minority groups).

Although the Supreme Court concluded in *Emporium Capwell* that the employees' concerted activity undercut the union and was pursued at the expense of the collective bargaining process, *Emporium Capwell* does not transform all unauthorized concerted activity into unprotected activity. *See E. Chi. Rehab. Ctr.,*

*Inc.*, 710 F.2d at 400. It is only when employees' activities undermine the union's objectives or the union's position as the exclusive bargaining authority that activities lose NLRA protection. *See id.* at 401. In other words, an employee's activities lose protection only when they were for the purposes of collective bargaining and were done to bargain with the employer over matters reserved for the union to negotiate, such as rates of pay, hours, and conditions of employment.

Our precedent confirms this distinction. "We have recognized, of course, that certain concerted activities may lose their protected character when in conflict with a union's status as exclusive bargaining representative." *See Richardson Paint Co. v. NLRB*, 574 F.2d 1195, 1206 (5th Cir. 1978).[9] But we have also said that there can "be circumstances in which an employee or a minority group of employees may engage, without reference of the matter to the union process, in action which is protected under [s]ection 7 [of the NLRA] though there is an agreement in force or in the process of negotiation." *NLRB v. Shop Rite Foods, Inc.*, 430 F.2d 786, 791 (5th Cir. 1970).

For example, in *Richardson Paint Co. v. NLRB*, we concluded that the "[p]eaceful circulation of a petition for presentation to an employer for redress of employee grievances is a protected concerted activity." 574 F.2d at 1206. We reasoned that "nothing

[9] All published cases of the former Fifth Circuit decided before the close of business on September 30, 1981, are precedent in this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

in [the employee's] circulation of the petition would *undermine the [u]nion's status as the bargaining representative*, or be so serious a threat to stable relations to cause [the employee's] act to lose its protected character," distinguishing the activities of the discharged employees in *Emporium Capwell* as being "of a far different character." *Id.* at 1205–06 (quotation omitted). At bottom, because the employee's action "was not in derogation of the [u]nion's status as exclusive bargaining agent, we agree[d] that [the employee's] conduct was protected concerted activity." *Id.* at 1207.

Our sister circuits have made the same distinction between protected concerted activity and activity that undermines the union's statutory role as exclusive bargainer.[10]  *See, e.g.*, *NLRB v. Noah's Ark Processors, LLC*, 31 F.4th 1097, 1104 (8th Cir. 2022) (explaining that the Board and courts agree that *Emporium Capwell* "did not strip the NLRA's protection from all wildcat strikes" and that a "case-by-case analysis is needed to determine whether a particular concerted work stoppage is protected by Section 7" (quotation omitted))[11]; *CC1 Ltd. P'ship*, 898 F.3d at 34 (explaining

---

[10] Security Walls posits that in *NLRB v. Tanner Motor Livery, Ltd.*, 419 F.2d 216 (9th Cir. 1969), "the Court found that concerted activity without union approval is presumed to be unprotected." But the Ninth Circuit made no such holding. Instead, the Court expressly "noted that section 9(a)'s provision for an exclusive bargaining representative [still] reserves the right of individual employees or groups of employees to deal with the employer regarding 'grievances.'" *Id.* at 218.

[11] "Wildcat" activity is activity undertaken by unionized employees without union authorization, support, or approval.

that concerted activity is unprotected only "when employees' activity undermines the [u]nion's objectives or position as bargaining authority"); *NLRB v. Bridgeport Ambulance Serv.*, 966 F.2d 725, 729 (2d Cir. 1992) (holding that a wildcat sit-in and walkout organized to protest low morale, poor equipment, unfair treatment, low wages, and favoritism constituted protected concerted activity when there was substantial evidence that the walkout was "not called for the purpose of bargaining directly with the [c]ompany and did not impair the [u]nion's performance as exclusive bargaining representative"); *E. Chi. Rehab.*, 710 F.2d at 402 ("Unless . . . a wildcat strike is called for the purpose of asserting a right to bargain collectively in the union's place or is likely, regardless of its purpose, to impair the union's performance as exclusive bargaining representative, section 9(a) does not put the strikers beyond the pale of section 7."); *NLRB v. Owners Maint. Corp.*, 581 F.2d 44, 49 (2d Cir. 1978) (distinguishing *Emporium Capwell* and holding that a wildcat leafletting campaign constituted protected concerted activity).

Accordingly, to prove that Kelley's activity was unprotected, Security Walls must show that his activities were for the purposes of collective bargaining and were done to bargain with Security Walls on union matters, such as rates of pay, wages, and other conditions of employment. *See Richardson Paint Co.*, 574 F.2d at 1205–06. Security Walls simply has not done so.

Security Walls argues that this case is like *Emporium Capwell* because "Kelley wanted to make the negotiated terms of the in-

22-11339                Opinion of the Court                23

place collective bargaining agreement more to his liking" without seeking support of the union or inviting the union into his discussions. Specifically, Security Walls contends that Kelley attempted to "renegotiate" shift schedules, wages, and assignment of work—topics that the collective bargaining agreement addresses. But, as we explain below, none of Kelley's activities actually undermined the collective bargaining agreement or the union's position as bargainer, making this case distinguishable from *Emporium Capwell*.[12]

The Board found that the facts of this case "contrast sharply with those in *Emporium Capwell*" because "Kelley did not resort to economic coercion to pressure [Security Walls] to bypass the [u]nion and deal with him directly, and there is no evidence that Kelley's demands or statements were inconsistent with the terms

---

[12] Security Walls also points to statements in Kelley's deposition to show that Kelley undermined the union. For example, when asked why he did not approach the union first with his workplace concerns, Kelley responded:

> In the experience I had with the [u]nion officers there, although I paid [the union's] dues to be a part of the [u]nion, our representation was of very poor quality. And things did not—they did not progress in—with any sense of urgency no matter (audio interference) what it was . . . .

But Kelley's view about the quality or efficacy of his union representation does not change the fact that he was not required to go to the union first. Under the facts of this case, section 7 protected his activities, and although he was not prohibited from pursuing union channels, the NLRA did not require him to either.

of the collective[]bargaining agreement then in effect or in derogation of the [u]nion's bargaining position." We agree.

Contrary to Security Walls's argument, Kelley was not attempting to negotiate new employment terms when he relayed employees' concerns about Security Walls's rumored change from five eight-hour shifts per week to three twelve-hour shifts per week. Kelley merely discussed the potential negative ramifications of the change with Security Walls and, at most, suggested that Security Walls reconsider its proposed shift modification.[13] Section 7 of the NLRA permits employees like Kelley to engage in concerted activity and present their grievances to their employer, so long as their activity does not infringe on the union representative's role as exclusive negotiator of the collective bargaining agreement. *See* 29 U.S.C. § 157; *Richardson Paint Co.*, 574 F.2d at 1205–06. Here, the facts fail to show that Kelley's activities undermined the union or conflicted with the collective bargaining agreement. Indeed, Security Walls has pointed to no

---

[13] Likewise, contrary to Security Walls's argument, Kelley's complaints about supervisory incompetence during the meeting in which he discussed the shift changes were not a "request to negotiate working conditions." Kelley simply raised employees' concerns about supervisory conduct. The record does not support Security Walls's claim that Kelley then requested to "negotiate" a resolution without the union.

In any event, to the extent that Security Walls implies that supervisory mistreatment of employees is a matter governed by the collective bargaining agreement, Security Walls fails to identify any provisions in the agreement inconsistent with Kelley's request, which was simply that employees be treated fairly and respectfully by supervisors.

evidence—and we see none—that the union was prejudiced or considered Kelley's conduct objectionable or in derogation of its bargaining position on any matter.[14]   Likewise, Kelley did not "request to negotiate wages," as Security Walls argues, when he called human resources about the underpayment and reimbursement issues that affected himself and another officer.[15] Instead, he simply wanted Security Walls to correct its mistakes and pay him and the other officer the proper amount—consistent with the collective bargaining agreement.  Finally, Kelley did not attempt to renegotiate the collective bargaining agreement by raising concerns that Robinson was assigning mandatory overtime to junior employees without proceeding through the seniority list in order.   Instead, as the Board correctly found, Kelley's "complaints . . . were consistent with the requirements of the collective-bargaining agreement," which provides that "[o]vertime shall be assigned on a rotating seniority basis."

Moreover, Kelley's activities are distinguishable from those in *Emporium Capwell*.  In *Emporium Capwell*, the dissident employees

---

[14] To the contrary, the record shows that the union stood with Kelley and filed a grievance on his behalf when Security Walls suspended him in retaliation for his concerted activity.

[15] To the extent Security Walls's argument is that Kelley attempted to renegotiate wages when he pointed out that the rumored shift changes may have compensation ramifications, Security Walls has failed to support its point.  Far from attempting to renegotiate wages, Kelley merely pointed out that such a shift change may have a disparate impact on dayshift employees as compared to nightshift employees.

acted against the express directions of the union; the union itself urged the dissident employees to halt their activities and warned that they might be terminated; and the employees took steps to pressure the company to renegotiate, directly with the employee group, terms that were already addressed in the parties' collective bargaining agreement.  420 U.S. at 52–56.  In contrast, here, the record is devoid of evidence that Kelley acted against union instructions, took any position contrary to the collective bargaining agreement or in derogation of the union's authority, or pressured Security Walls to bypass the union and negotiate with him directly.[16]

In short, the record does not support that Kelley attempted to renegotiate provisions contained in the collective bargaining agreement or undermine the union's role as its exclusive bargainer. Accordingly, Kelley did not need union approval or intervention for his activities.  Instead, as the Board found, his activities were covered by section 7.  Applying our deferential review, we agree with the Board's rational and supported conclusions that there is "no evidence" that the workplace issues that Kelley raised were inconsistent or in conflict with the collective bargaining agreement; "no basis to conclude that Kelley's conduct was

---

[16] Security Walls repeatedly asserts that Kelley's actions were inconsistent with the collective bargaining agreement.  But simply repeating an assertion does not make it true.  Security Walls fails to explain *how* Kelley's actions were inconsistent or in conflict with the collective bargaining agreement.

unprotected"; and no analogy between this case and *Emporium Capwell*.

### V.          Conclusion

Because Kelley's activity did not undermine the union's objectives or its position as a bargaining authority, we conclude that Kelley's activity was protected.

**Petition DENIED and cross-petition for enforcement GRANTED.**